# Martha L. Rogers, Ph.D.
## Clinical Psychology, Neuropsychology, & Forensic Psychology
### *A Professional Psychology Corporation*

**Office Location:**
**17662 Irvine Boulevard, Suite 12**
**Tustin, CA 92780-3133**

**License PSY-5718**
**Phone 714-606-4365**
**FAX 714-772-2245**
**Email** Rogersmartha@sbcglobal.net

**Mailing Address:**
**Box 3790**
**Anaheim, CA 92803-3790**

3/9/2006 1:13:38 PM

Mr. Mark Waecker, Esq.
500 South Grand Avenue, 21st Floor
Los Angeles, CA 90071

Re:   **USA v. John De La Cruz**
      **Case Number: 04-00185-02 SOM**
      **Appointment Status: None, privately retained**

### Report of Psychological Evaluation

**Referral Information:**   Mr. Waecker contacted this psychologist in early February, requesting that a comprehensive evaluation regarding his client be conducted with a goal of assessing any contributory factors to his offense and addressing any needed treatment and rehabilitation issues.

**Assessment Procedures:**  Mr. Waecker provided very extensive medical and pharmacy records of this defendant. They were also provided to Virginia Doland, Ph.D. who works as a medical/legal data analyst. Her analysis of the records was provided to me on 3/8/06; in addition, I also read the records myself.

I also asked for, received and reviewed the Presentence Investigation Report and other investigatory documents.

On 2/16/06, the defendant and his wife, Lisa, were seen at my private office at the above address. While the defendant completed written psychological testing, I interviewed his wife for 1.5 hours. After he completed written testing, I interviewed the defendant for 2 hours. The couple was also seen jointly.

The defendant completed the following psychological procedures: PSHQ, PAI, MAQ, SASSI-3.  For those not familiar with these instruments, a brief description can be found in Appendix 1.

Interviews were conducted face to face with use of a computer to take contemporaneous notes, which are not as accurate as that of a court reporter but they are substantially accurate and complete. Below, the interviewee's responses are italicized and questions by the examiner are in parentheses.

Since this case is occurring in Hawaii, the Court and Government are unlikely to be familiar with the undersigned examiner. My resume can be found in Appendix 2, and I invite you to contact the U.S. Attorney's Office in Los Angeles where there are a number of people who are familiar with my work.

## <u>Summary of Psychological/Social History Questionnaire and Interview Findings</u>

**Identifying Information:** The defendant is a 43 year old married hispanic male.

**Cultural/Language Factors:** He was born in the U. S. He considers English to be his first language, although he did not begin to learn English until age 4. Spanish was spoken most frequently at home while he was growing up. He attended school only in the U.S. Currently, the language most often spoken at home, with friends, or with coworkers is English. He generally prefers to read newspapers and magazines in English. He listens to/watches English and Spanish language radio/TV programs. He prefers Mexican cuisine. When asked to draw a line on a continuum depicting how much he prefers his parent culture vs. American culture more generally, he indicated a slight preference toward general American culture. He was offered the option of completing testing in Spanish or English. Overall, the information indicated that interviewing and testing Mr. De La Cruz would be best accomplished in the English language.

**Developmental History Factors:** He was not aware of any problems during his mother's pregnancy or delivery when he was born. His mother did not use alcohol or drugs during her pregnancy. There were no birth defects. He denied knowledge of any early childhood development problems. He reportedly met his physical milestones early, and his mental milestones were normal. He denied any medical problems during infancy or early childhood other than being hospitalized for bronchitis.

**Family of Origin History Factors:** He was raised by both parents to age 18. He denied any history of living with other relatives while growing up, being placed in foster care, or one of his parents leaving the home or dying before he

USA v. John Dela Cruz
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

3

1   was age 16. He denied any history of physical, sexual, or verbal abuse, or any
2   neglect or emotional unavailability of a parent. Neither parent was reported to
3   have suffered from mental illness, health problems, arrests/jail, or problems with
4   unemployment.
5
6       He has eight siblings and he is second to the oldest. He could not say that
7   he was closer to one or the other of his siblings in growing up, nor did he think
8   he had any more trouble with any of them. Today, as an adult, he feels he is
9   closer to his sister, Martina. He left home to be on his own the first time at age
10  19, but then returned home again at age 23.
11
12      When asked to tell me anything he wanted to about his mother, he
13  advised, *She always stood by me, always wanted to help me. I think she is a*
14  *little controlling. She has money, sometimes she throws it in my face -- will help*
15  *you pay the bills but you gotta ask.* (What did it cost you?) *My right arm*
16  [Laughs]. (Do you think this gives her more control over you?) *Maybe more*
17  *control -- I think she wants me to live my life the way she wants me to.* (If she
18  had her choice what would you do?) *Be in Sacramento, to move to Sacramento*
19  *with them. They want us.*
20
21      (How are you most like your mother?) *Conservative, stubborn, prideful,*
22  *hard working, ah sensitivity to life situations.* (How are you most different?) *Ah,*
23  *most different, ah...huh. Oh, ah a drive to have money. My mom always lived her*
24  *life to save that one penny to have something for her kids. I want a future for*
25  *my kids too but I also want a life with them. I could work seven days a week if I*
26  *wanted to. I do not work week-ends to be with my family. She is 'save, save,*
27  *save.' You never know when your last day will come so you should spend time*
28  *with your kids; they will be out the door before you know it. They worked every*
29  *day of their lives to leave their children something. The more money she makes,*
30  *it controls her.*
31
32      When asked to tell me anything he wanted to about his dad, he advised,
33  *I love my dad. Always stood by me, been there for me. Easy going,*
34  *understanding.*
35
36      (Have your parents helped you financially over the years of your
37  addiction?) *They only knew about my addiction in my teen years. They did not*
38  *know about the Vicodin. I managed to keep that hidden. I didn't live with them*
39  *so I was able to hide it. As far as helping in my younger years they knew I was*
40  *stealing cars so they would buy me a car. They wanted me to get away, would*
41  *entice me to move from Venice, would do what they can to get me away. Just*
42  *whatever they can. Offered to get me counseling but I never took it. They would*
43  *do whatever they could to help me clean up.*
44

USA v. John Dela Cruz                    4
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

(So when did your parents become aware of your current situation?) *That day my brother was arrested, I explained -- not exactly what had happened -- but we were both in trouble. Yes they are helping him too, financially. I think they wanted to give him 30 years because of two dealing priors. I thought he only had one – I did not know he had had two.*

**Educational History Factors:** He completed eleven years of schooling. He denied that he was ever held back a grade in school or being in any special education classes. He denied ever having problems with reading or writing, although when asked how difficult the PSHQ had been for him to answer, he said it had been a little difficult. He says that he does not like to read. When asked again in interview if he has problems reading, he advised, *Ah, it is kind of hard to stay interested in what I read, I do not read much for that reason.* He denied any history of academic, behavioral, or social problems in the school environment although he could not remember if/how many times he had been suspended from school. After dropping out of high school, he later completed a GED while in custody. When asked why he had dropped out, he indicated school had not been important to him at the time. He denies any subsequent vocational training or education.

**Occupational History Factors:** At the time of the evaluation, he was employed in the stucco and plastering field. He stated that the best job he ever had was with Wonder Bread, while the worst job he ever had was at Burger King because it was *hot and greasy.* The longest single job he ever had was at the Oakwood Apartments, a job which lasted six years, ending in 1996. While he denied ever being fired from a job, he estimated that he had quit jobs without having another one lined up about six times in his life. However, he denied having any problems on the job. He was never in the military.

Records indicate he worked for Hull Lumber for four years. From 1991-1996 he was an assistant manager at R&B Realty Group Properties in Van Nuys. From 1996-2003 he was employed by Wonder Bread. Since 1999 he received Worker's Compensation benefits as part of his injury settlement. He was rated as able to work but not to lift heavy objects. Since 1/10/05, he has been working full time as the lead foreman at A&D plastering in Gardena.

**Relationship History Factors:** The defendant was married the first time to Rosie at age 20, a relationship which lasted two years. He has been married to his second wife for the past fourteen years. They have never suffered any separations other than his incarceration. He denies that there has been any domestic violence or "push and shove" or hitting in any relationship. His wife also denies there has been any problem in this area.

After his wife had been separately interviewed, the defendant was interviewed regarding his perspectives on their marital problems with his wife present, by his preference. (Were there problems in your marriage when you came out of jail?) *Lack of money, infidelity. I kind of felt worthless, because I was not working. I did not know what kind of man I would be able to be. I was brought up to raise my kids to work hard for it. I just felt she was gonna leave me, because of the situation. I did not know what my future would be. I did not know if she was gonna stick around or be with someone else if I was disabled and not gonna support her. I accused her a lot. I took out a lot of anger on her when I couldn't find the drug. I did yell a lot. I was accusing her.* (Do you believe she had an affair?) I believe *she did have an affair, but now it does not really matter. I still love her.*

(What was your evidence?) *Because you can tell when things change, I started noticing she dressed up nicely. To me she was buying underwear and bras looked fancy.* [Wife was shaking her head 'no' during this discussion.] *I would catch her going to work in the morning, and those bras and panties, like she was trying to shield me. I called her work and another girl answers and she said, 'Anthony is this you?' 'No, this is her other husband.' 'Oh, I am sorry.' Those things came up. I was not looking for them. One day I remember walking the psychiatrist you were seeing. She wanted me to go with her. 'I know you are having an affair.' She said, 'I never said anything when I thought you were having one.' To me she admitted it without saying it. With all the other problems, just me not working and her infidelity.*

(Did you talk about it in counseling?) *We did. Dr. Gill. Everytime I went in there I was the bad person.* (Is this the counselor you stopped seeing?) [Lisa] *John didn't like him. He brought up the Vicodin, he felt it was the problem.*

(Lisa, what is your version of what happened?) *Dr. Gill was trying to get him to realize it was the Vicodin. You can hallucinate, but he says he is on my side. You find someone finally, so I said, 'Fine let's go.' And then he held it against me. 'OK, it is your fault.' That was a little of it, prior to the Worker's Comp and their decreasing his checks, he was feeling worthless. I think that was still in the back of his head. I was just accused the other day.*

(Did you give him a straight answer?) *I always said no.* (John, do you think that was that a straight answer?) *Now, yes. In general I do not know. I accepted Jesus Christ in my life in jail, so I am trying to live the way he would want us to live. In order to get past it. I believe she will not tell me so I just believe one day we stand in front of God -- if she did or didn't.* Lisa responded, *It is OK for him to judge but not OK for his sins to be pointed out; he is OK to judge me.* John replied, I *am trying to get past it – for our relationship.* Lisa

advised, *He does not understand. To him it was 'If I am locked up, you need to be locked up in the house.'* (So he was paranoid during his incarceration?) *Oh yes.*

**Parenting History Factors**:  The defendant has five children ranging in age from 5-19.  About the children he advised that there are *three between us. She has a previous marriage with an 18 year old child.  I have one from a previous marriage*, a 19 year old son. Their three children in common living in the home are ages 13, 8, 5.  He denies that he has ever asked a relative to take care of any of his children for an extended period of time. He denies that there has ever been any Child Protective Services or Social Services involvement with his family, or that any of his children have ever been in foster care.

**Health History Factors:**  The defendant was hospitalized at age 20 due to injuries received when he was stabbed several times. He was hospitalized again in 2002 for back surgery. He denies any history of head injury, loss of consciousness, or seizures. He denies that he currently has any medical or dental problems that have not been addressed. The last time he was examined by a physician was in March, 2006.

The defendant's medical and pharmacy records were carefully reviewed and analyzed. A detailed timeline of those analyses is available if desired. The following is a brief capsule.

- He suffered a work-related back injury on 7/26/98, following which he was returned to light duty on 8/6/98. He was treated with physical therapy, and not with medication. He was discharged from treatment on 8/28/98. This injury occurred when he was moving a 300 pound rack on wheels, when he felt a pop and had pain in his lower back as he pulled the rack. He woke up the following day with severe pain and stiffness.

- On 12/17/98, he was reinjured on the job. This time he was prescribed medication (Motrin, Darvocet), and in January, 1999, he was also given Flexeril and Relafen. He was returned to light duty on 1/7/99. By 1/20/99, he was described as improved after physical therapy three times weekly and medication. This injury occurred while on a delivery route. He was kneeling and setting up a delivery, and pulled on a 200 pound bread rack on wheels. He felt pain and heard a loud pop in his back, with pain extending to his right knee. The next morning he woke up with severe pain in his back, buttocks and right knee. He was diagnosed with post-traumatic lumbar sprain; lumbar radiculopathy, herniated disc by history on MIR.

USA v. John Dela Cruz
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

7

- He was reevaluated on 4/5/99 by Michael Schiffman, MD, when an MRI revealed a 3 millimeter disc protrusion at L5-S1. He was taking Tylenol #3 (with codeine) and continuing to work. He was treated conservatively with physical therapy and medication.

- Repeated reevaluations then followed, when he was being treated with physical therapy and medication. He reported that the PT *"helps temporarily."* A series of lumbar epidural steroid injections and facet blocks was then recommended.

- On 8/7/99, he pulled a bread rack toward himself and felt a pop in his lower back, and then felt pain and numbness in his buttocks and a burning sensation in his left thigh. It was reported that he saw a doctor for the insurance carrier on 8/9/99 but there were no first-hand records of this contact in the available file. By 8/16/99, the patient reported his back pain was worse. Observation of him during physical examination showed considerable difficulty. He was scheduled on 8/24/99 to see Dr. Russman regarding  the recommended epidural and facet block injections, which occurred on 9/10/99, 9/16/99, and 10/8/99. When subsequently reevaluated by Dr. Schiffman on 10/13/99, he was reportedly 60% improved from the injections. He was not working as modified work was not available. He was taking medications including pain medications and Soma, a muscle relaxant.

- It is noted that in the Presentencing Report on page 18, he was reported to have reached medical improvement and returned to full active duty on 11/22/99, but this does not entirely depict what transpired. There was an Agreed Medical Exam by Dr. Alban on 1/20/00. The basic history provided was consistent with prior history. He was treated with PT and sleep medications for 1 ½ months, while continuing to work his regular duties for Wonder Bread. It was noted that he was functioning but by the end of a strenuous work day, he had more pain. Dr. Alban commented, *Mr. De La Cruz impresses me as a straightforward individual, who is sincere and honest in the presentation of his complaints.* At this juncture, he was found to have reached maximal improvement and to be permanent and stationary for rating purposes. His condition precluded very heavy lifting or repetitive bending/stooping.

- Dr. Schiffman reexamined him on 2/10/00, at which time he did not require any further work restrictions.

USA v. John Dela Cruz
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

8

- On 11/10/00, he was reinjured, and was being treated with PT and medication. There is an apparent break in the available treatment records from 12/00 – 2/15/01.

- On 2/15/01 he underwent discography to determine the site of pain generation so that treatment could be directed for relief of his injuries. His preoperative diagnosis was intractable low back pain with multilevel disk protrusion and disk degeneration. The L5-S1 discogram was negative with moderate degeneration and a posterior annular defect.

- The available pharmacy records begin in 4/01. There is a break in the records in 5/04, and then more prescriptions follow from 11/04 through 10/05. This reflects his in-custody time. There are additional pharmacy records that are being sought, which may provide additional documentation of even deeper addiction than already documented. It is noted that, in particular, in the months just prior to the offense in 4/04, He was prescribed Soma twice daily and Vicodin Extra Strength up to 6 times daily. His Vicodin usage had been 4-6 times daily from 4/02 forward to the time of his arrest. He was obtaining pain medications from two different legal sources who reportedly did not know about one another. The defendant has also related that he was also obtaining drugs from illicit sources at the same time. There can be an additive or enhancing effect with muscle relaxants (such as Soma, Cyclobenzaprine, Flexeril all of which he was prescribed at one time or another) which have tranquilizing properties and narcotics. In reading the PDR entries for these medications it is noted that warnings are posted about these drug combinations. After his incarceration, he again was using pain medications and muscle relaxants although the amounts seem to have diminished.

- He underwent a lumbar fusion surgery on 4/15/02 at the L5-S1 level. He had not worked since November, 2000 because of his injuries. He was taking medications and was able to tolerate very limited activities after the surgery.

- On 6/12/02 he was involved in an automobile accident which exacerbated his pain problem somewhat. By 8/14/02, he still complained of intermittent moderate to occasionally severe pain but stated he was improved overall. He had difficulty with prolonged standing or sitting. He was wearing a support brace and taking medications and still not working. By 11/2/02, the pain continued unchanged.

- By 3/27/03 his pain was progressively worse. He felt the surgery had been of no benefit. This exacerbation of pain seems to correlate with his

increased Vicodin usage and he's probably into a rebound effect at this point [this examiner's opinion]. The Agreed Medical Reexamination on 5/13/03 by Dr. Alban found him permanent and stationary. Treatment continued.

- On 1/21/04, he was treated with bilateral facet blocks, L5-S1 with selective nerve root blocks on the right side. On 2/3/04 his impairment determination was 26% based on AMA's "Guide to the Evaluation of Permanent Impairment, 4th Edition." Range of motion studies by Stephan Stepaniuk, DC was found to be one third to two thirds of normal. He was referred for chiropractic treatment but prescription of medications continued up to 11/11/05.

**Psychiatric History Factors:**  He denies that he has ever seen any kind of doctor or counselor for mental health problems. He was asked to review a list of symptoms and to indicate which he had experienced in the past and he indicated the following: Paranoid; sleeplessness; confused thinking; believing things that I later realized are not true. He stated that all of these difficulties were drug-related. He noticed that these problems worsened when he drank or used drugs and they also worsened when he stopped using/withdrew.

**Substance Use/Abuse History Factors:**  The defendant admits that he has had a problem with alcohol. He has a history of a DUI while drinking. He stated that he has stopped using alcohol, but when he previously used alcohol, his typical consumption in an evening was two beers, and the most he ever consumed in a single evening was 12 beers. His last use of alcohol was in May, 2004, before his arrest.

The defendant admits that he has had a significant problem with street drugs in the past, particularly his adolescent and early adult years. But he resumed some illicit drug use in about 2002. His last usage of street drugs occurred before his arrest. As a young adult, his drug of choice was PCP but he used methamphetamine in recent years.

The defendant admits that he has had a problem with taking too many prescribed drugs, particularly Vicodin. He was asked on the PSHQ if this is a criminal case, had he been under the influence of drugs or withdrawing from them at the time of his current offense and he advised yes.

He indicated that the longest period of time he had ever gone without using any alcohol or illicit drugs prior to his arrest was a week. He denied that he had ever tried to reduce or stop his usage. He indicated that his problem with prescription drugs had entailed He previously was in one treatment program, a

1    PC 1000 educative program. He denied that he had ever been asked to leave any
2    treatment programs before completing them.
3
4         (At what age did you begin to use drugs and alcohol?) *My first year in*
5    *high school.* (What were you using at that time?) *I started with PCP angel dust.*
6    (How often were you using it?) *In high school maybe once a week until 11th*
7    *grade when I dropped out because I started getting high so much, and once or*
8    *twice on weekend. The dip was used on the weekend more.* (When would be the
9    last time you used PCP?) *Say about around 22 years old. When my first son was*
10   *born.*
11
12        (When did you start to use coke?) *In that same time frame -- kind of hard*
13   *to say how much -- whenever I got it, whenever it was available.* (When would
14   have been the last time?) *Up to about age 23-24. PCP -- I slipped out a couple of*
15   *times. I do not remember they say once I was at a party and I took off my pants*
16   *chasing some girls around. How true it was I do not know. Another time they*
17   *said I was at a park. I started running around and dropped my pants. I*
18   *remember a few times having deep hallucinations, like walking on water, flying*
19   *one time. Actually seeing my death one time. That was my drug of choice,*
20   *believe it or not.* (What did you like about PCP?) *It made me forget everything,*
21   *the situation you were in, where you were at, a way of escape from life, to get*
22   *away I guess.*
23
24        *I experimented with heroin.* (Did you snort it or shoot it?) *Shoot it, but I*
25   *OD'ed twice on it. A friend of mine was there and brought me back. I used it*
26   *when we were at a party, when it was there, when it was available. I didn't use*
27   *it a whole lot, say maybe once a month.*
28
29        *I experimented with marijuana but I did not really like that kind of high.*
30   *Pills --  back then it was reds, downers, and uppers, and sometimes I mixed*
31   *them. I was shooting the cocaine too.* (How often were you doing reds?) *On the*
32   *weekends I guess.* (How were you using meth?) *Smoking it, not shooting it.*
33   (How much of a habit did you have?) *When it was available.*
34
35        *About age 24, I was drinking more, a lot during the weekends, mostly get*
36   *drunk on the weekends. I had one drunk driving. I got thrown out of a few bars*
37   *but did not get arrested with it. I never really started the fights but friends would*
38   *get in arguments so I got involved so we ended up getting thrown out.*
39
40        (By age 24, had you lost jobs due to drugs or alcohol?) *Yes, I lost one,*
41   *because of the drunk driving. I was working at a lumber yard and I was a driver,*
42   *because of the DUI they had to let me go.*
43

USA v. John Dela Cruz                              11
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

1    (What drugs continued after age 24?) *Cocaine, pretty much into cocaine,*
2    *because everybody did it in bars and nightclubs. I could think of using meth only*
3    *twice that I remember. I smoked it a couple of times.*
4
5    (When did you begin to use meth again?) *Ah, I guess the latter part of*
6    *2002.* (How did that come about?) *I did it maybe twice, this plumber guy came*
7    *by to do some work and he had some. He smoked some in the bathroom and I*
8    *took a hit on it. During this time my worker's comp years, I had depression, and*
9    *was worried how I would make ends meet, so it was easy to say have a hit. I did*
10   *not see much else in my life, what is gonna happen? I did not know at the time*
11   *but 55% disabled. I did not have a college career, not much of an education, a*
12   *family of five, a mortgage, bills, so it was easy for me not to turn it down.*
13
14   (Did it make you temporarily feel better?) *The PCP makes everything go*
15   *away, so I thought maybe this can help for a few hours anyway. After that I*
16   *would be getting high, take another hit.* (How were you funding yourself?) *He*
17   *was a friend of mine but I do not know how he got it, but always because he*
18   *had it. I did not have to pay for a lot of it.*
19
20   (How does meth usage figure in to your current offense?) *Not at all. They*
21   *said I was working for my brother for a long time. I did not know what -- what I*
22   *was gonna do in Hawaii. All I knew was him to smoke marijuana.*
23
24   (You had a problem with pain pills and a meth habit?) *It was more pain*
25   *pills. I was in workers comp because of my lower back. I had surgery, L5 S1*
26   *disks taken out, titanium tubes put in because of the pain.*
27
28   *It was 1999 -- the last time when I left work. I already had a small habit,*
29   *at least 50 pills once a month, gradually worked up -- actually Tylenol 3 then to*
30   *Vicoden 500, then up to 750, to the point taking 6-7 at a time three times a day.*
31   (You were taking up to 18-20 Vicodin a day?) *Yes for at least a year, wasn't it*
32   *about a year?* [Defendant turns to his wife for her opinion.] *'Uh huh.'*
33
34   (How many were prescribed?) *Sixty every 10 days, my ortho surgeon 60*
35   *every 10 days,[1] the rest came from people who had prescriptions would sell*
36   *them to me -- everybody knew I had them -- somebody called me one time up*
37   *to $10/pill. People would give them to me, not always paying for it. Before you*
38   *knew it I was asking everybody. When somebody got hurt I would ask them for*
39   *the rest of their Vicodin. It felt weird -- now I can see clear because I have been*
40   *off them.*

---

[1] The pharmacy records seem to indicate he was prescribe up to 180 pills every 30 days, which breaks down to 60 every 10 days. See Health History Factors for a summary of the pharmacy records.

*I saw the world in a white glaze. I was high all the time. It made it easier to go to Hawaii. I ran out and I asked the girl, made three phone calls. 'I need something, find me something.' She had a patch -- you melt it down and smoke it. It was a narcotic of some sort. But I never got it.* (So did they get you any pills while you were there?) *No. I went to a liquor store bought extra strength Tylenol.* (Were you withdrawing while in Hawaii?) *Only up to the last day, I had been looking for them just that morning. I was all right until evening. At 1 AM took my last 6 or 7. It was 1 AM 3 days after. I had plenty during the time of the offense. It made everything go smooth, in that state. I was not in pain, it kind of helped with the anxiety going through that situation.*

(You were also using meth at that time?) *It had a different an upper high. I had gotten so used to the Vicodin high more like a heroin high. The meth almost made my back hurt...*

(You said the Presentence Report was not accurate that you were using 2 grams a day of meth?) *It was maybe 2 grams a week, was ...sometimes it was once a week. I did not have habits like most people like go get the fix every day. I was never stuck on one thing. I never had to have one drug, even the PCP was not the only drug. One day around nobody, next day around people so 'Let's do it.' Only thing I ever needed was Vicodin. The withdrawal was nasty...shiver, pain amplified almost three times as great. I could not take enough aspirin. I was on the phone day and night looking for something. People who sold those pills going out and look for them, just anybody I knew I would call. I could not sleep, pains in my arms and legs, it was a withdrawal pain.*

(When you were using PCP, was it daily?) *It is not the kind of drug to make you want it, I hung out we smoked it if we had it.* (Are you disputing the Presentence Report that says your usage was daily between ages 18-21?) *Some weeks it would be daily, other weeks twice, some weeks twice a day. Angel dust you could smoke 3-4 times a day, because it is not as concentrated as a dipped cigarette. Angel dust -- I sold that too -- at times I had as much as I wanted.* (So what about between ages 18-21, is their report accurate?) *Inaccurate. It was on average maybe once every 2-3 days.*

(Is their account of your crack habit accurate?) *Crack – accurate – it was a 2-3 year habit, yes. And I was selling PCP to support that habit. Not as late as age 25-26, inaccurate as far as the age, think it was maybe age 21-22.*

(What about their report on your meth usage?) *No, no, not accurate at all, an average once a month.* (You told me 2 grams a week?) *Maybe, sometime you go a month without it.*

(And your alcohol usage from age 16-25 was a six pack a week?) From 17, yeah on the weekends, progressed after age 24. (Onlly a six pack a week?) Yes, sometimes a 6 pack or two six packs on a weekend.

(What is the most you ever drank in a single day?) *A case in single day.* His wife suggested this had occurred about age 28. (How much alcohol were you drinking prior to arrest?) *A six pack a week maybe, mix it with Vicodin.* (Did you usually use them together?) *Not always, most of the time by itself.* (What was the effect of combining alcohol and Vicodin?) *The Vicodin is more like a heroin feeling, your head does not spin, you actually are in control of your feelings. Add the alcohol your head spins, equilibrium gets off -- you can't drive. The day after an irritable bowel.* (Did you use alcohol when you could not get Vicodin?) *Yes, it helped. No substitute but it helped with just not being able to have it then and there.*

He appears to have used significant amounts of "muscle relaxants" which were prescribed which are known to have tranquilizing effects and to magnify the effects of alcohol or pain medications. He also apparently obtained Valium on the street.

**Social Stability/Legal History Factors:** He stated he had been arrested three or four times prior to age 18. As an adult, he estimated he had been arrested twice. In the past, he had been on formal probation. He denied that he had ever been required to attend therapy or classes of any kind as a part of probation. He could not remember if he had ever been required by a court to participate in AA/NA or other classes or group counseling.

He estimated he had been in custody about five times, and the longest period of incarceration was about four months. He denied that he had ever been found incompetent to stand trial.

(How many arrests did you have as a juvenile?) *Once? Well, no, I got arrested for track marks, and once for possession of uncontrolled substance, PCP. As much as I remember. I went to a drug diversion, just classes or something. I was stealing cars during that time.[2] I was a gang member and stealing cars.* (How many times were you arrested?) *A few times.* (How much jail time did you do?) *In jail around age 18, they got fed up – yeah -- and I went to*

---

[2] The Presentencing Report indicated he had been arrested twice in 1979 for Grand Theft Auto – no dispositions indicated.

USA v. John Dela Cruz
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

14

*jail for 6 months and only did 4 months. After that, nothing.* (So your last arrest was at age 18?) *Yes, around 18 or 19.*[3]

(Tell me what you did that you didn't get caught for.) *During the younger years I was selling PCP, supporting my habit, selling a little bit of cocaine back then. About age 22-23 on I was using a little bit. Then I cut down on the drugs and started drinking more. I found new friends; they were not into the drugs but drank a lot....*

(Were you doing some dealing with your brother?) *It was on my own. Not a mass production, just enough to support my habit. During those younger years I was not working so I had to have some way of supporting my drug habit.* (At that time were you aware of your brother dealing?) *He never used, he smoked weed and that was it.* (So he wasn't using even up to this last incident?) *Yes, that is all he was doing.*

He denied having been unemployed during the past five years. He denied ever being homeless or living out of his car. He denied ever having had property repossessions, suspensions or revocation of driver's license, evictions, or bankruptcies. He denied that he had ever lived with other relatives or friends for a significant period of time because he could not afford his own place.

About the current offense, he says he did talk with investigating officers and told them the entire truth about what occurred, and he was also able to tell his attorney everything that happened.

**Current Criminal Offense Factors:** The defendant was asked to relate in his own words the circumstances surrounding the current offense. *The time of my Worker's Compensation days, I was hurting for money. I picked up my back garage and rented it out for income when I met the plumber guy so I got a little involved in that. I did not see my brother every day. He did not drive fancy cars or have jewelry like most dealers. I did not think he was a big drug dealer, thought maybe he sold some to support his habit because that is what I used to do.*

*One day I asked for him to borrow money. It is hard for me to ask, but he lent me $300-400 to pay a bill. And then bills were coming up a lot. With what*

---

[3]   The Presentencing Report indicates that between 12/13/83-12/20/86 he was arrested for possession/manufacturing or selling a dangerous weapon, being under the influence of a controlled substance, and disobeying direction of traffic control but prosecution was denied for lack of probable cause. ON 1/3/87 he was arrested for use or being under the influence of PCP but the charge was dismissed on 3/17/87 and he was sentenced to "probation/jail." ON 4/1/90 he was arrested for excessive blood alcohol level, sentenced to probation and a fine. This appears to be the end of his criminal record until 5/10/04.

1   *Worker's Compensation income of $340, things really backed up. I was gonna*
2   *have to sell the house but where do I go with all my kids? It was expensive in*
3   *that town. I asked him, 'What can I do to make a little bit of money?' He did not*
4   *really want me involved in his business in the first place. He said, 'I ain't got*
5   *money to lend you all the time.' I asked again. 'I really need to make some*
6   *money. I do not want to lose everything.' I thought maybe picking up a pound of*
7   *weed, maybe trafficking a little weed. At that time I was selling some weed to*
8   *make a little money. What I can buy -- the bill I was spending I was not making*
9   *any profit so it was not working out. I figured if I could work for him, I would not*
10  *have to put out my own money and what he gave me would be all profit. I*
11  *thought it might work out better.*
12
13  *        A month or 2 weeks later, he said, 'You can go to Hawaii and do this for*
14  *me.' 'Hawaii?' At the time he did not say what, 'Just be prepared. I will call you.'*
15  *He made arrangements. Before I even knew it, I was on a plane. What the hell is*
16  *this? I always knew the best marijuana was grown in Hawaii. I have known that*
17  *since my teenage years. Maybe smuggle back a pound of weed or something.*
18  *Even at that time, the airports were not as strict so I figured I can get away with*
19  *it. 'You gonna meet this one guy.' He set me up in a hotel, talking about how*
20  *things were, nothing going on about drugs. I was so nervous. I watch a lot of*
21  *Law and Order they are taping these things. I knew he worked for my brother so*
22  *I was not gonna say a lot to get me in trouble. I was kind of paranoid at the*
23  *time. What the hell am I doing? He set me up at the hotel. I was real nervous.*
24  *He gave me just a little bag. Two baggies that big. 'You will give this.' I thought*
25  *it was cocaine. I just threw it in the safe. He came back the next day. 'You didn't*
26  *unwrap it?' 'Guy is gonna want his meth, all you have to do is hand it to him.*
27  *Some guy and girl gonna come to the room.' I was gonna hand the package and*
28  *call my brother when they were there. Does my brother know him?*
29
30  *        Everything went so fast, I didn't ask anything. Does my brother know him*
31  *or her? Your brother knows the girl, like giving him a sample of future*
32  *transactions. He just left. Then the following day my brother says, 'OK they are*
33  *coming up, this is what you do. You hand them the page tell them you want*
34  *$400. Get to know him and call me back while you are in the room? Do not say*
35  *nothing over the phone.' I could not ask questions. He did not like talking on the*
36  *phone. The girl comes, 'You Joe's brother?' 'Yes.' She introduced me to this guy.*
37  *We sat and talked a little bit. The guy said, 'You have the stuff?' I said, 'Do you*
38  *have the money?' He pulled out $400. I went to the safe, he looked at it, put in*
39  *his pouch. 'What do I do if I wanted to get more?' I had another in the safe but I*
40  *didn't want him to know it. I said, 'Call my brother.' 'You're not the big guy.' 'No,*
41  *I am here doing somebody a favor.' I talked to my brother in Spanish,*
42  *'Everything taken care of -- guess she will call you.' At the time he was trying to*
43  *get me to go have a drink with them, but I was so nervous I just stayed in the*

*room. I flew back. He gave me some money, like $600 plus he paid the plane fare. It just ended. We spent the money on the bills. Two weeks later got a phone call that he had been arrested. Some girl called he was arrested in Hawaii. My sister in law called to Hawaii to the police and they did say they had him.*

*That is when I thought, 'Oh, man, my whole world turning.' At first I did not think I would be involved but I knew I did that transaction -- It is gonna turn around and bite me. I got scared, and left for Sacramento. My sister lives down there. Me and my mom jumped in the car and went to Sacramento. I thought, 'They might come after me.'* (Why were you going to Sacramento?) *For fear.* (To get away?) *I felt when the transaction would bite me and I just didn't know what I was thinking so I went to Sacramento. The next day sister calls the Public Defender in Hawaii. And they said they wanted me to turn myself in. I had never met those people. Then I got down there, had an attorney hired. I found out that whole conversation was taped, given it to an undercover police officer so not much I could say about that.*

(Had you done any favors for your brother before?) *I had dropped off packages -- wrapped packages to his customers -- I think twice? He gave me a couple hundred dollars 2-3 times. I never bothered to ask what was in them, as long as I got paid.*

**Self-Description/Self-Appraisal Factors:** The defendant was asked to review some sentence stems and complete them, providing information about himself. He completed selected items. **An event that made me angry was...***mostly angry with myself after I've done something stupid.* **An event which made me cry was...***the situation I'm in now and how much trouble I was in.* **An event which made me proud was...***the day my first born came into this world.* **The thing I like about myself the best is...(my strongest points are...)...***down to earth and generous.* **The thing I like about myself the least is...(my weakest points are...)...***procrastinate.* **Something that will never change about myself is...***that I love life.* **The happiest or best thing in my life right now is...***my family.* **If I could turn the clock back and unring the bell, I would...***never start getting high.*

**When I get stressed out, what I do is...***was get high (before this trouble).* **When I get stressed out, what I need to do is...***know that things aren't that bad.* **If I could change anything in my life, it would be...***nothing.* **The biggest mistake I have ever made was...***going to Hawaii.* **If I had three wishes that could come true...***my back get fixed, not go to jail, my family be well.* **If I could be any age, I would like to be...***my present age.* **Five years from now...***Have these troubles past me have a good job to support my family give back to the community.* **I would like the**

**inscription on my tombstone to read...**_Here lies husband and father well respected honest and loved by all._ **My most important 'core values' are...**_honest care honest love of life, respectful._

He was asked to describe the time in his life, over a year or two, in which he felt he had functioned at his best overall, in his relationships and his responsibilities. About this he advised, _When I started dating my wife there came a time when I thought I wasn't ready to settle down and was prepared to leave her with our first child, but thought about it and my responsibilities kicked in. I'm glad I stayed and I still love her today with two more kids. I was 26 years old._

He was also asked to identify the period of time in his life in which he thought he had functioned at his worst: _When I first hurt my back and found out that I had a herniated disk life looked uncertain and I gave into the pain medication and I let the situation dictate my life. I should have taken over the situation._

He was then asked to let his worst time be equal to zero and his best time equal to a hundred and to rate where he would place himself at present: _I would put myself at about 80 because of these present problems. I have accepted Jesus Christ into my life. I have learned to be a better husband and father. I have realized how valuable life is. In kind of a strange way it was good it happened (getting arrested). I got off the drugs and alcohol. I'm working again and paying my bills. I realize there's a lot to live for. I'm not perfect but there's room to grow._

He was asked for his views of what has changed in his life since his arrest. _While I was in jail took Moneysmart, a six week program, an instructor came in. A parenting class I took, also about six weeks. (Your wife said you worked out on a treadmill while you were in jail.) Yes, good things come from this, a lot of good things. My back problems are better because I lost 40 pounds. I was sleeping on the mattress I had in jail -- it really helped me sleep. My health was very good. (So how much pain do you have now) On a scale 1-10, maybe a 5. There are days where I have no pain whatsoever, it has gotten better. The job is a little demanding makes my back hurt but it is better than it was before._

_And we got into church, we go pretty regularly. God is trying to help guide my life now. I see life in a different way._ (So now you see what is important and what is not?) _Exactly. I have been doing everything my Probation Officer asked. I have never gone past my curfew. I tested clean for the last year and a month._

_I have cravings – I am not gonna lie. Everytime I get a backache, there's a desire to take a pill but I remember where I was at and that helps real quick._

USA v. John Dela Cruz                                                    18
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

1   (You had a very big wake up call.) *Very big. In a way it actually saved my life. I*
2   *was having so much pain on my side. I knew my liver would be going out. I was*
3   *getting a lot of pain on my side. The pharmacist in my doctor's office you take*
4   *enough they will damage your liver. I knew sooner or later actually when I had*
5   *the surgery a guy having a biopsy on his liver had used so many his liver had*
6   *gone out. I would take more Vicodin for my liver pain, knowing that was what*
7   *was causing it. It so happened I was arrested, now have no pain whatsoever in*
8   *my side. Who knows what would have happened?* (I think your addiction to the
9   narcotic reached the point that you had a rebound effect; this means that
10  continuing to take it resulted in the pain actually getting worse.) *I know*
11  *something it did enhance the actual pain, made it worse.  The Probation Report*
12  *said 2 a day. I do not know where she got that from, it was like 21 a day.*
13
14  ## Collateral Interview with Defendant's Spouse:
15
16      His wife, Lisa, was interviewed at my request. She was seen in a separate
17  face to face session on the same day as the defendant was completing written
18  psychological testing.    She then participated in a joint interview with the
19  defendant later in the day.
20
21      (In the last year, he has been abstinent, so what differences have you
22  seen in him?) *He is more involved in church. The Sunday program, goes for two*
23  *hours, then church for an hour. He looks forward to Sunday, it makes us happy;*
24  *we were catholic before, we turned Christian in Honolulu. We were practicing*
25  *catholics here; now he goes to church and showing the children the difference.*
26  *His moods have changed. He is not sitting in front of the TV all day like he used*
27  *to.* (So now is he different with the kids?) *He interacts with the children or goes*
28  *to the gym.* (So now he is working out?) *He is working out, tries to go three*
29  *times a week, for his own sanity and health, and for his back problems which he*
30  *has had in the past five years.*
31
32      (So now, how is his back?) *It is a little better now that he works out. And*
33  *his job as a plasterer, he is constantly bending.* (So is he doing OK with the back
34  on the job?) *Sometimes he is in pain but has to go and try and work it out.* (Is
35  he taking any meds now?) *No, in May, 2004 at that time he had to take the*
36  *medication off, he was on Vicodin. He went cold turkey and had withdrawals --*
37  *he does talk about it now. it was a rude awakening. He got in trouble so he had*
38  *to turn himself in 2004.* (How long was he incarcerated?) *Nine months, got out*
39  *December 30, 2004. Since January, 2005, he has been working for a straight*
40  *year. He has not had any problems testing, on the job, or with the probation. He*
41  *works for A & D Sandblasting.* (Did he seek medical help?) *He was doing*
42  *treadmill while in custody, and lost like 30-40 pounds. He came out looking like a*
43  *stick, but maybe it was stress too.*

Lisa advised that their problems were multiplied because they were financially burdened with his injuries on the job. He had to go on disability and this cut his income by more than half, from *$940 every two weeks, then it dropped to $300.* (So what was the result in your lives with the injury plus financial problems?) *Our relationship drifted further and further apart. He got worse and worse with the Vicodin. His mood swings, not wanting to go anywhere, paranoid -- he became a real jerk.* (Were you aware that he was addicted to Vicodin at that time?) *He said it was not the Vicodin. I thought it was just our problems that we had, but it really hit hard when his income went to $300 from $940. I still have the same job. We were in process of losing our house, which we lost when he came out of jail -- we decided to get out.*

(Do you think his medical problems increased due to financial pressure?) *I believe so.* (Was he complaining of a lot of pain?) *Pain, yes, and I think he was not feeling it as being a man and not taking care of his family.* (So do you think it was less pain than the emotional consequences of loss of work and income?) *Yes, we were having problems.* (Can you capsule what you saw happening?) *He hid how much Vicodin. He would tell me 'a couple' but it was more than a couple a day.* (So how did you find out?) *Just from phone calls, people calling looking for him. He would say, 'Do not worry about it.' He would indicate I was having an affair. I said, 'You are way out there. Here I am having financial problems, how is an affair gonna help me? Just what I need, another asshole!'*

(Was he using any drugs other than prescribed meds?) *No. He used to drink, and be an asshole. He would forget how he acted the night before* [Laughs]. *He probably did drink and used Vicodin, not often.* (Is he still using alcohol?) *No, he does not drink.* (Did he stop drinking when he came out of jail?) *Yes, he was tested for alcohol as well.* (Before he went to jail, was he a problem drinker?) *No.* (Did he behave like an asshole when he was drinking?) *Yes, with both Vicodin and drinking.* (When he drank, how much would he usually drink?) *A six pack, with friends when he would drink, and then the Vicodin came later, but mainly it was all Vicodin. He had stopped drinking prior to this incident.*

(At time of this incident was he still using a lot of Vicodin) *Yes.* (Did he admit to you?) *No, I asked him. 'None of your business.'* (But he's admitted it now?) *Yes, I would tell him, 'It is not working, not relieving your pain, so why are you taking 2, 3, 4, 5 of them?' He was constantly told, 'You will lose your liver.' I do not understand why he is prescribing so much. Under the condition of his injury, having the surgery, it not relieving all the pain, still taking a lot. Gosh, I thought it would reduce it. Anti-inflammatories and Vicodin, so it did not make sense that an orthopedic doctor would push it -- even going back in 30 days. 'My 60 is gone' and them not asking why. They said he was in a tremendous pain. I*

*didn't believe him 'til recently when I hurt my back. I only took it if I had to, but I do not care for pills.*

*(Did you know him when he was using methamphetamine?) No, we laughed about his younger days but I did not know him. No he has been strong about street drugs.*

*(Since you've known him has he had any DUI's?) Before I met him he had DUI's. (But none since you've been married?) No.*

*(Do you think his drug use was the cause of any of your financial problems?) Ah, I do not know how to answer that. When they claimed him only 60% disabled, him not being able to provide, he got depressed, took the medications more, but would never tell me where he was going throughout the day. One day he said, 'I have to go turn myself in.' 'What?' Then all hell broke lose.*

*(What can you tell me about his brother who was involved in this case?) I know him but never spent time with him; he has a big family. I would not say they are all close; that is my opinion. I struggled with his family while he was gone. I do not have too much good to say. I did not even know he and that brother were connected. He told me 'Do not worry' and 'mind your own business.' What happened was my first time knowing anything. (since) does not talk about his case. I never even met his attorney.*

*His mother and sister are helping him in taking care of this case. He is working with them. I have not been a part of it. I am sure he does not see me as helping with this case. They are paying the bills. I have a full plate myself, taking care of my kids, going to work, not knowing what or if. I am sure he thinks about it all the time. He tends to shut down a little bit – I am sure he is worried as well. We do not know what we are looking at. We do not know the effects on kids. I hope he gets probation.*

*I have greater problems beside him. I have to think about how to keep the family together. They went through their own trauma in the nine months, his younger son age 8 was affected the most. The girls seem to be OK but were missing him. The younger son got separation anxiety. I had to tell Michael that 'Dad is not at school; dad did something naughty and has to pay for what he has done.' I think he didn't care -- just wanted to make sure his dad was coming back.*

*(Do you think the two of you will make it or do you not know?) I am hoping we are gonna make it, something we can talk about later on, and start a*

1  *new life somewhere -- start all over, get a house back. We cannot make any*
2  *strong decisions right now because it is not written in stone that he will be on*
3  *probation. It depends on the judge. We are living at my mother's at this time,*
4  *and awaiting the sentence before ... we have been there since January.*
5
6      (Is there anything else you can tell me that will help me understand what
7  has happened?) *The man that did this -- what they are saying he has committed*
8  *-- is not the John I know* [Smiling]. *He is a family person, we spend our*
9  *Saturdays taking our children out, a show, lunch, then our Sunday. One day a*
10 *week our time together by ourselves and find a babysitter. Over the years his*
11 *back problem had increased and he became somebody I did not know. I blocked*
12 *because I did not like what he became. Not the John I knew. John was always*
13 *walking the straight line.*
14
15     (Has he gone to AA, or NA?) *No, he was looking for that, mentioned to*
16 *me but he has not done that.*
17
18     (Does he have any other kinds of addictions, compulsions, gambling,
19 spending impulsivity, pornography?) *No. No money gambling.* (Do you think he
20 would he gamble if he had the money?) *No, he saves every penny for his kids,*
21 *does not like to even buy clothes for himself.*
22
23     (Tell me about his mother and sister.) *His mother - His sister is a*
24 *translater.* (Do you think they appreciate the whole situation?) *No, only focusing*
25 *on John, and John indicated to them -- because of his paranoid thinking, he told*
26 *them I was having an affair. We turned him in. I went to Hawaii with him to turn*
27 *himself in.* (Has the idea that you had an affair ever been corrected?) *No, he has*
28 *not corrected it* [Laughs]. (Do you think he believes it, or do you think he is
29 worried he will lose face with his family if he corrects it?) *He probably figures I*
30 *am replaceable. He has his money with his family.* (Is he paranoid about other
31 things?) *Not really. I work in the psychiatric field. Front desk financial counselor*
32 *in a psychiatric department. There's a team of addiction doctors and I confided*
33 *with them over certain situations, they said this is paranoia maybe because he*
34 *was on the drugs too long.*
35
36     (Do you think he still feels you had an affair?) *I do not think so. ...He has*
37 *a lot of sisters that like to run their mouths, and he never knew how to say, 'My*
38 *wife comes first.' It is always his mother. I had a long time to think about my*
39 *situation while he was gone. It actually it was OK not having to hear it. I stopped*
40 *talking -- I saw where they stood. I thought they would be more supportive*
41 *toward my children but it did not work out that way.*
42

1  (Did you know of him using Valium?) *I was not aware of valium, I do not*
2  *remember. He fell asleep a lot.* (Did he use Soma?) *Yes, it made him nod out. I*
3  *probably was aware -- I just did not want to see it too. I recall the cough syrup*
4  *with codeine. I remember being sick, yeah I had it. He would use mine if he had*
5  *it.* (You were not aware of him using meth?) *No.* (Were there times that he did
6  not eat, not sleep?) *He would say the Vicodin kept him up.* (Would he stay up?)
7  *He would stay up all night, watch TV.*
8
9  (So financially, did you see money disappear?) *I would ask him if he took*
10 *any money out, then when I went to do calculations, I would look through his*
11 *drawers and find that he did take it out.* (Was this ever a point of discussion?)
12 *Yes, but I stopped asking him -- what is the use? It is gone. A lot of times I did*
13 *not feel like arguing. I'd leave him in front of the TV, come home after leaving in*
14 *the morning and he'd still be on the couch.*
15
16 (Do you know what he was actually charged with?) *Selling to an*
17 *undercover, no?* (Do know what he was selling?) *No, I do not.* (Or how much he
18 was selling?) *No, I do not.*
19
20 (Have you had any marital therapy?) *Yes. We did that before. It was*
21 *good, when he came out, it took a couple of months, by April, and family*
22 *therapy for our little boy. The psychiatrist said, 'I need to see you two back*
23 *here.' We eventually -- Michael got better -- and we stayed on. He is better, he*
24 *sees his dad; they like to see the form of the home, mom, dad, siblings. If dad is*
25 *gone he panicks.*
26
27 ## Summary of Psychological Testing
28
29 **Personality Factors:**   The defendant was administered the PAI-CS as a
30 measure of personality functioning, comparing his responses to normal
31 community, psychiatric, and incarcerated population test norms.

32 **PAI Clinical Summary:** It appears that this defendant provided a valid
33 PAI profile.  This defendant's clinical scale elevation profile suggests that the
34 defendant is experiencing mild to moderate psychiatric distress and
35 impairment. This distress appears to be manifested in somatization, e.g. an
36 exacerbation of physical symptomatology that may have emotional contributions.
37 The clinical presentation may be complicated by substance use problems.

38 This defendant's profile suggests additional psychological and
39 interpersonal aspects (e.g., motivation, social support, interpersonal dominance)
40 that may have implications for how well he responds to rehabilitative programs
41 or incarceration.

**Report Validity Details:** This defendant left no items unanswered.

The Infrequency (*INF*) scale was not significantly elevated, indicating that the defendant did not endorse highly unusual behaviors and experiences. It is likely that he carefully read and understood a majority of the items. The Inconsistency (*ICN*) scale score was also not significantly elevated, suggesting that the defendant responded to the PAI items in a consistent manner. The Inconsistency Corrections Index (*ICN-C*) was not significant, indicating that he admitted to some history of illegal behavior and legal difficulties. This history is likely to be true in light of the circumstances surrounding his current legal situation.

The Negative Impression Management (*NIM)* score was not significantly elevated, suggesting the likelihood that, in general, the defendant did not attempt to exaggerate or distort negative characteristics or psychiatric symptoms as assessed by this scale. The Malingering Index (*MAL*) is not significantly elevated. The current PAI profile does not possess many of the characteristics commonly observed in profiles produced by research participants instructed to simulate psychiatric disturbance. The Rogers Discriminant Function (*RDF*), an empirically-derived malingering index based on multiple PAI scale elevations, was unremarkable. The current pattern of scale elevations is not consistent with profiles of individuals instructed to simulate psychiatric disturbance.

The Positive Impression Management (*PIM)* scale was not significantly elevated, suggesting that the defendant did not make an overt attempt to portray an overly positive image of himself. It is likely that he was able to acknowledge potential problems in certain areas when answering PAI items. The Defensiveness Index (*DEF*) was not significantly elevated. A *DEF* score in this range indicates that the defendant's profile configuration is not highly similar to the PAI scale configurations observed in research participants asked to present a positive impression. The multiple scale elevations used to compute the Cashel Discriminant Function (*CDF*) which assesses more subtle "faking good" also suggest that he was relatively open and forthright, given that his profile was not similar to those produced by defensive individuals.

Thus, overall, the resulting PAI profile appears to be remarkably "straight arrow," with no attempt to dissimulate, exaggerate, or minimize his difficulties. This can be seen as a positive sign that he is seeking to be accurate in his self-report.

**Clinical Scale Elevations:** The PAI provides an assessment of the psychological and emotional functioning of respondents, in comparison to community norms unless otherwise noted. Additional data obtained from the respondent's history and clinical evaluation will be valuable for making accurate treatment and management decisions.

USA v. John Dela Cruz                          24
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

This defendant's clinical scale profile elevation is above the mean clinical scale elevation observed in the Corrections normative sample. Three of the clinical scales were moderately or highly elevated, suggesting that the defendant is experiencing psychiatric distress and emotional impairment in one or more areas. This defendant's clinical scale profile elevation is above the mean clinical elevation observed in the Corrections normative sample. Psychological maladjustment could interfere with this defendant's ability to adapt to institutionalization.

Elevations on both the *DRG* and *ALC* scales indicate that this defendant has significant drug and alcohol problems and that he is likely to exhibit polysubstance use or dependence. It is very likely that he has used drugs and alcohol excessively and that he has experienced repeated behavioral, interpersonal, and psychosocial problems because of this use. He reported that he went through withdrawal when he was incarcerated for several months after his arrest. Despite the noted elevation, this *ALC* score is relatively common for defendants housed in correctional facilities. Despite the noted elevation, a *DRG* score at this level is also relatively common in defendants housed in correctional facilities. He also acknowledged involvement in criminal or antisocial actions. Further evaluation outside the testing is required to examine the relationship between his antisocial behavior and his substance use.

The defendant reported an elevated level of somatic complaints and concern about his health condition and physical functioning. *SOM* scores at this level are elevated in comparison to both community and correctional samples. The nature of his complaints is somewhat vague and nonspecific. Such complaints may reflect either a medical or psychiatric disorder or combination of both. His concern about his health problems is much higher than average, and he indicated functional impairment related to his health conditions. Additionally, he described somewhat unusual sensory and motor problems that may be associated with pain syndromes.

His psychosomatic issues were evaluated further with the Wahler Physical Symptoms Inventory (WPSI) which surveys his physical complaints in more detail and compares him with patient populations. Here, his results placed him in the high average range compared to general medical patient populations. Most of his symptoms relate to pain – back or neck pain, pain in the extremities including hands or feet or muscular tension, weakness, and fatigue. However there are scattered symptoms across other systems, e.g. feeling hot or cold regardless of the weather, difficulty sleeping, intestinal or stomach trouble, excessive gas, bowel trouble, nausea.

**PAI Substance Abuse Scales:** Simultaneous consideration of the substance use scales (i.e., *ALC, DRG*) and the other clinical scales (in comparison to community adults) suggests that this defendant is likely to have co-occurring psychiatric and substance use problems. It is important to note that the

USA v. John Dela Cruz                                          25
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

defendant's problems with substance use are likely to co-occur with mild to moderate pathology. Co-occurring psychiatric and substance use disorders increase the severity of both disorders, worsens the defendant's prognosis, and may require integrated treatments that deal with both the mental health and substance use problems.

**Interpersonal Dynamics:** In comparison to community adults, relatively high levels of dominance, in conjunction with low levels of warmth, characterize the interpersonal style of this defendant. He is likely to be controlling and hostile in many of his relationships, and he may see little need to maintain positive and affiliative relationships with others in his environment. Others are likely to view him as somewhat prone to be competitive, disagreeable, or colder in his interactions. Such characteristics may create some difficulties in responding appropriately to rehabilitative efforts and suggest a somewhat elevated risk for poor treatment outcomes. If he becomes involved in rehabilitative services, control issues may need to be a focus of treatment for this defendant. His low level of warmth is complicated by a higher degree of suspiciousness and hypersensitivity. Furthermore, he also reported a high level of interpersonal problems, suggesting that his interpersonal tendencies have not allowed him to effectively negotiate close relationships. This result appears consistent with my observations of him in interaction with his wife. He tries to maintain control by withholding information from her that might reflect on his manhood. He misinterprets her behaviors, evidencing distortions due to his own psychological projections.

**Social Support Issues:** This defendant reported that the amount and degree of social support in his life is adequate at this time. However, it is not possible to discern from this information whether this defendant's social network is a positive or negative influence in terms of his likelihood of benefiting from treatment or rehabilitative efforts or of his likelihood of recidivating. Further clarification of the valence (i.e., positive, negative) and source of support (e.g., family, treatment providers, peers) is recommended. In interview, it was noted that his positive support system includes family members.

**Behavioral Controls:** Most or all defendants in correctional settings are likely to endorse antisocial attitudes, values, and beliefs to some extent, and this individual's pattern of responding is somewhat atypical in comparison to offender samples. Defendants with similar profiles endorse antisocial traits and behaviors somewhat less than most defendants in correctional settings.

As with other inmates, interventions aimed at reducing criminogenic beliefs and cognitive distortions may constitute an important component of rehabilitative efforts with this individual. Defendants with similar profiles endorse antisocial traits and behaviors somewhat more so than the general community population, but somewhat less than most defendants in correctional settings. Such defendants are generally less likely to engage in aggressive behavior, such