as physical violence, acts of defiance, or verbal aggression. Compared to defendants with more elevated *ANT* scores (i.e., $T \geq 60$), defendants with profiles similar to this individual generally are less likely to engage in institutional misconduct. However, his interpersonal conflicts may interfere with positive or close relationships.

With respect to anger control issues, the defendant described his temper as within the typical range for community adults in the PAI census-matched standardization sample. Such a response style is typical of most individuals within correctional settings. Interventions focused on anger management strategies may be beneficial but may not necessarily be the primary focus of rehabilitative efforts for this defendant.

**Treatment Amenability:** In terms of treatment amenability, this defendant acknowledged some problem areas in his life and expresses a generally positive attitude toward lifestyle changes and taking responsibility for his actions. Although his motivation for treatment is at a level that is typical of community adults in the PAI census-matched standardization sample, it is somewhat below average compared to offender samples. If participating in treatment programming, such individuals are at some risk for non-compliance or resistance and should be closely tracked. Treatment strategies oriented towards increasing motivation for change may be beneficial for this individual.

**Substance Abuse Factors:** The defendant completed the SASSI-3 and the MAQ, the results of which are integrated below.

**Validity Considerations**: On the MAQ, he was reasonable consistent, and no more defensive than others entering substance abuse treatment programs. On the SASSI-3, he appears to be responding openly and consistently.

**Summary Scores:** The MAQ Emotional Distress summary score reflects the overall level of turmoil and stress at present, and his score is average compared to others in a substance abuse treatment sample. He is able to acknowledge distress and is likely to characterize substance use as a problem, but he is not overwhelmed by his current difficulties. Thus he is likely to have sufficient drive and energy available to participate in or benefit from substance abuse treatment.

On the SASSI-3, based on the actuarial decision rules, he evidences a pattern consistent with a high probability that he has a substance dependence disorder. His problem appears to be more significant for drugs than for alcohol.

**Admission of Substance Abuse Problems**: He was more open than many about his drug abuse problem as seen on the MAQ but least open in seeking help for his problem. He reports that it is difficult for him to ask for help ("extremely"). Consistent with the PAI, he does not appear to be grossly minimizing his drug or alcohol problem. But he sees himself as not having a

USA v. John Dela Cruz                                                          27
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

severe problem with alcohol while he acknowledges a problem with drug abuse. When asked to what degree he is powerless over alcohol or drugs, he says "a little bit," and he is willing to admit to being addicted "moderately." He has reported intravenous drug abuse ("quite a bit").

**Detriment/Resistance to Treatment**: His MAQ scores place him in an average range compared to others entering substance abuse treatment, e.g. there is some resistance although he acknowledges that he requires help to control his problem and he does not appear resentful about being required to be in treatment. He does not appear to report unusual levels of craving that could trigger relapse although he says that his problems "force" him to drink or use drugs ("Moderately"). He will need help in developing alternative coping strategies.

His MAQ ANT (Antisocial) score of 56 is a bit higher than that seen in most people entering substance abuse treatment, although as seen on the PAI, it is likely to be lower than seen in most people in corrections samples. His Corrections (COR) score on the SASSI-3 suggests that his substance abuse problems are possibly more severe than others in the SASSI data base who are in a corrections setting. It should be noted that the SASSI or MAQ populations are likely to have fewer subjects proportionately in a corrections setting whereas on the PAI, he can be compared directly with others who are actually in custody. He is not in custody at this time so he's not an exact match to any of the comparative groups.

He reports being discouraged about the future ("extremely") so positive, attainable goals need to be set if treatment gains are to be maintained over the long term. On the positive side, he describes himself as wanting to stay sober or clean ("extremely"), willing to attend AA or NA meetings ("extremely"). It is noted, however, that as of the time of the evaluation, he had not been attending such meetings.

## Discussion of Findings and Recommendations

This defendant is beginning to face up to his serious prescribed drug and illicit drug habits. I think he has turned the corner. There has been some secretiveness and lack of full disclosure with his wife, but to his credit, he decided to have her participate with him in the interview I conducted. I told him I needed complete disclosure and if her presence would inhibit him, then he should do it without her, but he decided he wanted her to remain in the room.

Their relationship has been seriously compromised by his drug and financial habits. He projected his fears of loss on her, misinterpreting events and thinking that she was having an affair when she was at times making herself feel better by buying nice clothes or lingerie. She frankly advised that she was too busy compensating for his lack of help to have an affair. On some level, his

1   blaming of her became a way of excusing himself for his drug habit. They still
2   have considerable repair work to do on their marriage.  She has been the
3   primary breadwinner in addition to taking care of the children through the last
4   several years. She would like to keep the marriage and would be willing to
5   participate in further marital counseling with him, even though it cannot be
6   legally mandated that she do so. While they had some counseling previously,
7   and successfully dealt with their little boy's separation anxiety due to dad's
8   incarceration, but the marital problems were not resolved. The defendant
9   became upset when the doctor confronted him on his Vicodin usage and therapy
10  was terminated. Future counseling should be set up where he does not have an
11  option of terminating because he becomes uncomfortable.
12
13      Despite his discomfort in completely leveling with his wife, the defendant
14  appears to have been a very "straight arrow" reporter on the psychological
15  testing, not having triggered validity problems of either exaggeration or denial
16  and minimization. Hence, it appears he was really trying to give accurate
17  information. From the perspective of interviews, those given to Probation as well
18  as to the current examiner, he has not been completely consistent about his
19  drug use. He also appears to have hidden his methamphetamine and valium
20  usage from his wife, both of which were obtained illegally. She was not fully
21  aware of the massive amounts of pain medications he was being prescribed but
22  she had some suspicion he was obtaining them illegally in addition to the
23  prescriptions. She was aware of him staying up all night at times, likely to reflect
24  methamphetamine use. She was aware that he nodded off and she thought this
25  was the muscle relaxants, but it could have also been the illicit valium combined
26  with alcohol and/or pain medications.  She reported that his mood could turn
27  nasty with either Vicodin or alcohol, and he admits having mixed the two or used
28  alcohol when he could not get enough Vicodin.
29
30      It appears from the available records that the defendant has been off all
31  pain medications since October, 2005.  He has learned that losing weight and
32  working out has improved his pain problem. He has also learned that the pain is
33  actually worsened when the medication usage is excessive. Based on the
34  psychological assessment, in my judgment this was a man who had marked
35  problems with illicit drug addiction across his lifespan, and he learned to cope
36  with ordinary stresses by using alcohol or drugs. When his adult life situation
37  worsened, particularly as a result of his work-related injuries and subsequent
38  financial distress, his pain medication usage raged out of control and became a
39  way of escaping from his deflated self-esteem of no longer being able to be the
40  man of the family.
41
42      Based on all the information presently available to me, it is my opinion
43  that his prescription drug dependency was definitely a contributing factor in the

present offense.  He experienced resulting financial distress from both the lost income due to work-related injuries as well as his drug usage, which led to his desperation and willingness to help his brother in drug deals. From the available records, he appears to have been a minor participant in the drug-dealing operation. He was admittedly involved in a gang in his younger adolescent and young adult years, but it appears that his criminal activities ceased many years ago until the recent problem.

He does seem to have made use of some useful self-help educative programs while in custody, to have worked out, and to have lost weight which reduced the physical contribution to his chronic back pain. Surgery seemed not to have helped him very much, and his deep drug addiction likely resulted in a rebound effect, causing increased problems with pain and a vicious cycle of increased addiction.

He is an individual who will cooperate with any needed drug and alcohol treatment program and such treatment should be required as part of his conditions upon release from custody. There should be strict accountability because it was his lack of accountability to anyone that contributed to the addiction spiraling completely out of control. He should be randomly screened for alcohol, prescribed, and illicit drugs on a frequent basis. As a part of a rehabilitative substance abuse program, there should be a requirement of at least twice weekly participation in an AA/NA Twelve Step program, with reporting slips back to Probation. He should be required to get a Sponsor and to work the steps. Attendance at open AA/NA meetings will be of limited use to this man. The steps will help him better take an inventory of how he has deceived himself and others and made excuses due to his drug usage. Marital therapy and participation in an Al-Anon group would be beneficial to his wife and further the goal of more open communication. His failed marital communication allowed his addiction to continue unchecked.

Since failed pain management due to his back injuries was a major contributor to his pain medication addiction, he also needs a medical treatment program which will address his chronic pain management problems. There are other avenues of treatment that are available that do not entail use of medications that would be preventive of future relapse of pain problems.  For example, he might benefit from relaxation training, biofeedback, specific prescriptive exercise programs, stress management classes, and psychotherapy. There is an emotional component to his pain, which he, as a proud hispanic man who is highly concerned about how he appears to others has not yet addressed.

As part of monitoring his pain management difficulties, the defendant should be permitted only to be seen by one designated MD who will make

USA v. John Dela Cruz
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

30

decisions about any medical referrals he may need. He should not be seeing multiple physicians. If any physician is seen on an emergency basis, the contact information must be reported to his primary care physician within 24 hours. An open release of information should be obtained between Probation and the designated MD.

This report needs to be provided to all health care providers, including any medical, psychological, PT, substance abuse rehabilitation providers.

He clearly is at the point that intensive rehabilitative efforts and programming will be a benefit. If there is further information I can provide, please feel free to contact me.

Respectfully Submitted,

Martha L. Rogers, Ph.D.[4]

Martha L. Rogers, Ph.D.

---

[4] Signed electronically, personally, by Dr. Rogers at 3/9/2006 1:13:14 PM

**Appendix 1**

**Description of Assessment Tools**

**A Rationale for Multi-Method Assessment Including Psychological Testing:** A recent review[5] of data from over 125 meta-analyses on test validity (medical, psychological, structured diagnostic interviews) with 800 samples including over 190,000 patients utilizing multimethod assessments demonstrated that psychological test validity is "strong and compelling," that psychological test validity "is comparable to medical test validity," and that different assessment methods "provide unique sources of information." Clinical judgment is always required, but the utilization of actuarial methods can help immensely in the process of drawing more accurate conclusions. As stated by a prominent critic of psychological research and practices, Faust[6] noted that "...the power of individualized judgment is often overestimated and that of [actuarial] generalization underestimated, resulting in many avoidable mistakes....(Page 352).

Clinicians who rely primarily on one method of evaluation, e.g. interviewing, "are prone to incomplete understandings." The available research shows that even well-known published structured psychiatric interview methods, although highly reliable, do not fare well in validity studies as multi-method assessment procedures including psychological testing. The reasons for this problem are complex, including the fact that even with open and cooperative patients seeking help for their problems, reliance upon patient statements as the main or only source of information is not as reliable or valid.[7] The problem is much greater in forensic examinations.

Meyer, *et al.* (2001) have stated the problems very well in achieving valid findings that face every forensic examiner: "Most of the time, clinician interviews are not systematic or structured. "When interviews are unstructured, clinicians may overlook certain areas of functioning and focus more exclusively on presenting complaints. When interviews are highly structured, clinicians can lose the forest for the trees and make precise but errant judgments...Such mistakes may occur when the clinician focuses on responses to specific interview questions (e.g. diagnostic criteria) without fully considering the salience of these

---

[5] Meyer, G. J., Finn, S. E., Eyde, L. D., Kay, G. G., Moreland, K. L., Dies, R. R., Eisman, E. J. Kubiszyn, T. W., Reed, G. M. (February, 2001). Psychological testing and psychological assessment: A review of evidence and issues. **American Psychologist**, 56(2), 128-165.

[6] Faust, D. (1997). Of science, meta-science, and clinical practice: The generalization of a generalization to a particular. **Journal of Personality Assessment**, 68(2), 331-354.

[7] Meyer, G. J. (I2002). Distinctions among information gathering methods and implications for a refined taxonomy of psychopathology. In L. E. Beutler & M. Malik [Editors], **Alternatives to the DSM-IV**. Washington, DC: American Psychological Association.

USA v. John Dela Cruz                                                    32
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

1  responses in the patient's broader life context or without adequately recognizing
2  how the individual responses fit together into a symptomatically coherent pattern
3  [Citations omitted].
4
5      "Additional confounds derive from patients, who are often poor historians
6  and/or biased presenters of information [Citations omitted]. For instance,
7  neurologically impaired patients frequently lack awareness of their deficits or
8  personality changes...and response styles such as defensiveness or exaggeration
9  affect the way patients are viewed by clinical interviewers or observers [Citations
10  omitted]. Defensive patients are seen as more healthy, whereas patients who
11  exaggerate their distress are seen as more impaired. In contrast to less formal
12  clinical methods, psychological testing can identify such biased self-presentation
13  styles [Citations omitted], leading to a more accurate understanding of the
14  patient's genuine difficulties (Page 144)." Under the requirements of Daubert[8],
15  the clinician must consider using a range of methods (structured and
16  unstructured interview, self-report, behavior samples or performance measures,
17  observational, historical, informant) that provide independent sources of
18  information to be integrated as a means of anchoring one's clinical judgments,
19  and at least some of which provide benchmarks based on the rate of false
20  positives or negatives.
21
22      The whole issue of 'what is scientific' and what is psychology's empirical
23  placement within an implicit hierarchy of the sciences has been addressed in the
24  literature based on a composite of primary indicators of scientific status
25  (theories-to-laws ratio, consultation rate, obsolescence rate, graph prominence,
26  early impact rate, peer evaluation consensus, citation concentration). This
27  measure was then validated through five secondary indicators (lecture
28  disfluency, citation immediacy, anticipation frequency, age at receipt of Nobel
29  Prize, rated disciplinary hardness.  What emerged was a single dimension on
30  which five disciplines could be reliably ranked in the following order: Physics,
31  chemistry, biology, psychology, and sociology. *Significantly, psychology placed*
32  *much closer to biology than to sociology, forming a pair of life sciences clearly*
33  *separated from the other sciences.*[9]
34
35  **Maryland Addictions Questionnaire (MAQ):[10]**  The MAQ is intended for use
36  with individuals age 17 and older who can read at a 5th grade level or above.

---

[8] Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786 (1993).

[9] Simonton, D. K. (2004). Psychology's status as a scientific discipline: Its empirical placement within an implicit hierarchy of the sciences. **Review of General Psychology**, 8(1), 59-67.

[10] O'Donnell, W. E., DeSoto, C. B. & DeSoto, J. L. (1997).  **Maryland Addictions Questionnaire (MAQ) Manual.** Los Angeles, CA: Western Psychological Services.

Respondents are asked to indicate whether a statement describes their experience or applies to them. Some refer to recent time frames and others at any time in the past. It is intended to be used for intake purposes for individual who are entering alcohol and drug abuse evaluation or treatment programs. It surveys issues relevant to the severity of patients' alcohol and drug abuse history. Critical issues, such as motivation for and attitudes toward treatment are included along with any history of antisocial behaviors, and patients' appraisals of their own ability to control addictive behaviors, of their dravings, and of the adequacy of their social skills. They also report psychological symptoms such as cognitive distress, social anxiety, and depression which frequently occur during the early stages of withdrawal from addictive substances. Two validity indices provide a way to evaluate test taking attitudes and consistency. Standard scores for the MAQ are based on data from 983 men and women receiving substance abuse treatment at outpatient clinics, residential treatment facilities for individuals convicted of driving while intoxicated, or in half-way house programs. All of the subjects had been evaluated as having an alcohol or drug abuse problems.

**Personality Assessment Inventory (PAI), Personality Assessment — Correctional Sample (PAI-CS):** [11] The PAI is a 344-item multiple choice "broad band" personality instrument first published in 1991 and was initially normed on community/non-psychiatric as well as psychiatric populations and more recently on male and female correctional populations (2005).[12] It may be used to supplement information gained from the social history, interview, and MMPI-2. Or it may be used in lieu of the MMPI-2. It is 40% shorter, is written at a fourth grade reading level, which has advantage for cautious use with English as second language subjects or lower educational level subjects. It is also available in the Spanish language. The PAI was developed in the U.S. for use with adults based on a normative standardization sample stratified on gender, race, and age according to 1995 U.S. Census projections, as well as clinical patients. Because it is a relatively recent instrument, the amount of research thus far accrued is less than the MMPI-2, although its construction is much more consistent with modern psychometric principles. According to Dr. Kavan's review, despite some weaknesses, *the instrument has decent reliability and validity. Unlike the MMPI-2 and Millon Clinical Multiaxial Inventory II, the PAI contains*

---

[11] Morey, L. C. **The Personality Assessment Inventory Professional Manual**. Odessa, FL: Psychological Assessment Resources.

Morey, L. C. (1996). **An Interpretive Guide to the Personality Assessment Inventory (PAI).** Odessa, FL: Psychological Assessment Resources.

[12] Edens, J. F. & Ruiz, M. A. (2005). **PAI Interpretive Report for Correctional Settings (PAI-CS) Professional Manual.** Odessa, FL: Psychological Assessment Resources, Inc.

USA v. John Dela Cruz                                                    34
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

*non-overlapping scales that enhance its discriminant validity....*[13] The responses are entered into computer scoring and interpretive software licensed by PAR in order to generate scores, subscores, profile, and actuarial predictions based upon score patterns and critical items. The results are interpreted in light of known scientific literature regarding similar profile types. The examiner can compare the results with community norms or psychiatric norms.

The correctional version of the PAI[14] was normed on incarcerated individuals in multiple settings ranging from jails, to prisons, and forensic psychiatric hospitals. It may be less helpful for assessing severely mentally ill inmates or those offenders who are under supervision in the community. In some cases both the community/clinical version may be preferable and/or the results from both versions can be studied comparatively.  While the clinical version does not differentiate between male and female subjects, there are some differences by gender that are noteworthy in a correctional sample, so separate norms are available. It is noted that such correctional + gender norms are available on very few personality instruments. The correctional version also includes additional experimental validity scales and an additional Addictive Characteristics Scale. Otherwise, the available scales are the same across the two report versions. The test items are exactly the same in both versions. The correctional version provides information about institutional risk factors.

The PAI is available in both Spanish and English, and in cases of bilingual subjects, they are offered both versions and allowed to choose between them, or to use them in tandem.

**Psychological Social History Questionnaire (PSHQ):**    Examinees are administered a very comprehensive questionnaire which is a 25-page short-answer and multiple choice instrument designed to collect information about various areas of functioning across the lifespan.  This instrument was authored by Dr. Rogers and has been periodically revised and updated based on experience with its use over the years, most recently in 2004.  <u>It is not considered a test nor is it a normed instrument.</u>  No scores are generated and no comparison to other persons is offered; it is used as a qualitative assay based on the respondent's autobiographical retrospective memory, which can be influenced by his/her motivational level or compromised by various factors.  We use the PSHQ in order to make certain that we have systematically covered basic

---

[13] Kavan, M. G. (1995).  Review of the Personality Assessment Inventory.  In Conoley, J. C. & Impara, J. C.  [Editors] (1995). **The Twelfth Mental Measurements Yearbook.** Lincoln, Nebraska: Buros Institute of Mental Measurements, pp. 766-768.

[14] Edens, J. F. & Ruiz, M. A. (2005).  **PAI Interpretive Report for Correctional Settings (PAI-CS) Professional Manual.** Odessa, Florida: Psychological Assessment Resources, Inc.

factors of influence in the patient's functioning, e.g. the patient's family of origin, cultural/linguistic, developmental, educational, military, occupational, economic, legal, genetic, health, relationship, substance use and treatment, psychiatric treatment, legal, criminal, life stressors, life stability, and recreational histories, as well as self-ascribed adequacy of coping, and self-ascribed life perspectives and satisfactions. Obtaining information in this form then allows us to more efficiently identify areas in the respondent's background that will require more in-depth interviewing and to free up the time for those issues rather than focusing unnecessarily on the basic fact patterns of his or her life.  We have observed over many years that some subjects are more forthcoming about their histories in a written format and others in a face-to-face interview format, so we routinely utilize both.   Utilizing just interview often results in less systematic or less detailed review of the history than is possible with a written instrument, while utilizing just written assessment would be limited by failure to probe for inconsistencies and more qualitative data.  There are actually several versions of this instrument, intended to provide more in depth coverage in particular types of cases.

The respondent is advised verbally and in writing about rights of privacy, how to decline answering particular test items, the right to consult one's attorney, and the consequences of lying or leaving out information if the evaluation is part of a court case. When the questionnaire is being used as part of a legal evaluation, the respondent is asked to sign a certification that the information provided is true and complete to the best of his knowledge.

**Substance Abuse Subtle Screening Inventory -3 (SASSI-3):** [15]   The SASSI is a measure of both direct and indirect measured propensities for substance abuse. Direct admissions are first analyzed, and then there is a series of items which have been found to predict chemical dependency even in individuals who may not have made direct admissions.  There are two versions of this test, one for adolescents and one for adults. Results were scored, profiled and interpreted in light of published literature on this measure.

---

[15] Miller, G. (2001).  **Substance Abuse Subtle Screening Inventory (SASSI-3)**.  Springville, IN: SASSI Institute. www.sassi.com

USA v. John Dela Cruz
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

36

1
2
3
4
5
6

| Martha L. Rogers, Ph.D. |
| --- |

**Birthdate:**    November 22, 1942         **Birthplace:** Raleigh, North Carolina

## Areas of Most Frequent Current Professional Work

| **Main specialty qualifications** | Clinical   Psychology   (1975)   Forensic   Psychology,   (1983), Neuropsychology (2001) |
| --- | --- |
| **Criminal Law** | Juvenile and adult criminal, including competency to stand trial, competency to waive Miranda Rights, competency to ender a plea; insanity, diminished actuality; evaluation of dangerousness; persons accused of sexual assault including adult and juvenile offenders; internet sexually related crimes; victims of sexual assault and other crimes, including children; Juvenile 707 fitness hearings; assessment of domestic violence, stalking; homicide; neuropsychological issues. |
| **Civil Law** | Child custody, dependency, guardianship, adoption; 300 WI proceedings; personal injury/psychological trauma; work stress; evaluation of alleged abuse perpetrators; neuropsychological issues; evaluation of alleged victims of abuse; evaluation of victims of sexual involvement while in treatment with health care providers for plaintiff or defense; standard of care and malpractice in mental health care providers |
| **Case Review and Consultation** | Provision of critiques of experts' psychiatric or psychological evaluations, including determination of reliability and validity of test data findings and conclusions; assisting in the writing of effective cross examination questions; computerized data base searches for relevant/current scientific literature regarding particular mental health issues raised in evaluations or testimony |

7

## Formal Education and Supervised Training

| **10/98 to 1/01** | Post-doctoral Certificate program in Neuropsychology, Fielding Institute. Primary Irvine cluster supervisors: Arnold Purisch, Ph.D. and Robert Sbordone, Ph.D. Formal classwork, practica, supervised cases totaling approximately 1,600 clock hours (Adult + pediatric) plus required papers, case presentations, examinations [62 Semester Hours] Completed and passed all requirements for the Certificate on 1/27/01. |
| --- | --- |
| **9/81 to 6/83** | Informal postdoctoral training in forensic psychology, San Bernardino, CA. Supervised experience under Steve Lawrence, Ph.D., ABFP in criminal, civil (personal injury), family law, juvenile dependency, worker's compensation, and social security disability |
| **9/74 to 8/75** | APA-approved Clinical Psychology Internship, University of North Carolina School of Medicine, Chapel Hill, NC. Major rotations in Pediatric Neurology, Pediatrics/Psychiatry Consultation Liaison, psychiatric |

USA v. John Dela Cruz
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

37

| | |
|---|---|
| 9/70 to 8/74 | inpatient services, adult psychiatric outpatient services, rape crisis team, emergency room psychiatric services<br>University of Wyoming, Laramie; MA, PhD in APA-approved clinical psychology doctoral program; substantial work in physiology, physiological psychology, pharmacology, and community psychology |
| 9/60 to 5/64 | University of North Carolina at Greensboro. B.A. in Biology; undergraduate studies in biology, psychology and course work for certification in secondary education |

## Academic Appointments

| | |
|---|---|
| 7/01 to 6/02 | Pepperdine University, Department of Graduate School of Education and Psychology, Adjunct Faculty.  I taught a course in clinical assessment for clinical psychology graduate students. |
| 2/96 to 6/96 | University of California at Irvine, School of Social Ecology. Co-Instructor with Alison Clarke-Stewart, Ph.D. Professor in a graduate seminar in child abuse issues |
| 6/78 to 6/98 | Rosemead School of Psychology, Biola University, La Mirada, CA. I was an Associate Professor from 6/78 to 6/83, teaching the clinical assessment course sequence to doctoral students in child and adult assessment; supervised doctoral students in educational, clinical outpatient and hospital practica; thereafter mentored students in a forensic psychology practicum rotation in my practice, supervised doctoral dissertation research students, presented occasional seminars, occasionally reviewed articles for publication in their Journal of Psychology and Theology |
| 9/76 to 1/78 | Harbor/UCLA Medical Center, Torrance, CA. Adjunct clinical faculty: Supervised intern and postdoctoral trainees in clinical assessment and testing; occasional seminars for several years thereafter |
| 9/75 to 5/76 | St. Mary's University, San Antonio, TX. Adjunct Assistant Professor. Taught clinical assessment to MA program in Clinical Psychology on part-time basis |
| 6/73 to 8/73 | University of Wyoming Counseling Center: Served as therapist for UW students in individual and group treatment, design and planning of special seminars |
| 9/72 to 5/73 | University of Wyoming, Department of Psychology, Teaching Assistant: Supervised doctoral students in the School of Education in intellectual assessment of adults and children |
| 9/71 to 5/72 | University of Wyoming, Department of Psychology, Teaching Assistant: Advanced undergraduate experimental psychology laboratories |

1

USA v. John Dela Cruz
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

38

## Professional Societies and Leadership Roles

| | |
|---|---|
| **8/75 to Present** | American Psychological Association (APA), Divisions 5 [Measurement], 12 [Clinical Psychology], 40 [Law and Psychology], 41 [Neuropsychology] |
| **1978 to 1999** | California Psychology Association (CPA); Served on the CPA Ethics Committee, 5/91 to 11/98 |
| **1992 to Present** | Orange County Psychological Association (OCPA); served on the OCPA Board from 1992-1995 |
| **1978 to Present** | Society of Personality Assessment (SPA) |
| **1990 to Present** | International Society of Child Abuse and Neglect |
| **1993 to Present** | American Professional Society on the Abuse of Children |
| **1993 to Present** | International Society for Traumatic Stress Studies; occasional Editorial Reviewer for Journal of Traumatic Stress |
| **2001 to Present** | National Academy of Neuropsychology |
| **2001 to Present** | International Neuropsychological Society |

## Other Professional Milestones

| | |
|---|---|
| **6/96** | Invited scholar at the NATO Advanced Study Institute on trauma and memory, Port de Bourganay, France (One of 7 from CA, one of 29 from the US, with the remaining 70 scholars from around the world. Participation was competitively selected and NATO provided funding |
| **12/93** | Chair, Research conference on trauma and memory, Clark University, Worcester, Massachusetts; Clark University obtained a grant to fund this closed research conference of 20 researchers and practitioners from the U.S. and Canada involved in the recovered memory issue; I was responsible for setting up the program and involved in the selection of participants |
| **1992 to Present** | Commissioner for the Board of Psychology (Oral examiner for licensure as a psychologist in CA |
| **1992 to Present** | Case Reviewer and Examiner for the Board of Psychology: Review cases where complaints have been made in order to evaluate standard of care issues; also have consulted with the Medical Board to develop training materials for Medical Board Investigators |
| **1989 to 1995** | Board of Prison Terms, California Department of Corrections, Approved Independent Examiner: Evaluate prisoners in regard to future dangerousness and mental illness contributing to their crimes |

USA v. John Dela Cruz                                           39
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

| | |
|---|---|
| **8/83 to Present** | Orange County Superior Court, Expert Witness Panel for adult criminal defendants; Superior Court Juvenile Expert Panel for juvenile criminal cases and child dependency cases since inception of this panel in 1992, left panel in 2001; Family Law panel  expert in family law since 1982 |
| **1982 to Present** | Department of Public Social Services, San Bernardino County, consultant in evaluation of minors, parents under court supervision, prospective or current foster parents or adoptive parents and expert witness where required |
| **1981 to Present** | San Bernardino County Superior Courts and Riverside County Superior Courts expert witness panel from 1981-1983 since 1983, adult or juvenile criminal cases by court appointment on a "call in advance" basis |
| **11/78 to Present** | Licensed as Psychologist, California Board of Psychology, License # PSY-5718 |
| **1978** | Licensed as Psychologist, Arizona Board of Psychology (License inactive) |
| **1978** | Licensed as School Psychologist, Arizona State Department of Education (License inactive) |
| **1977 to 2000** | National Register of Health Service Providers in Psychology, Certificate # 19615. I voluntarily terminated my National Register membership as I could see no discernible benefit being derived for the profession or for myself individually. |
| **1976 to 1978** | Licensed as Psychologist with health services provider status, Texas State Board of Examiners (License inactive) |
| **1974 to 1975** | Martin S. Wallach Award for Outstanding Intern in Clinical Psychology, Department of Psychiatry, University of North Carolina School of Medicine, Chapel Hill |
| **1974 to 1976** | U. S. Air Force Health Service Providers Scholarship (Full tuition, supplies, fees and living expenses) |

1
2

## Selected Past or Forthcoming Presentations, Research and Publications

**Note:**  I have numbers of publications or presentations from 1975-1990 which are not listed here. Earlier works were eclectic in nature, ranging from assessment, family therapy, psychotherapy outcomes, substance abuse issues. My work in the past ten years has centered around forensic psychology, autobiographical memory, cognition, neuropsychology of memory problems in abuse cases. The most important works since 1990 are listed below, from most recent to most remote.

**6/1-5/05**
Primer of Legal Issues for Pastoral Counselors

A Primer of Mental Health Emergencies for the Pastoral Counselor: ABC's of What to do First

2005 Convocation of the New Order of Glastonbury, Cortez, Colorado:  Invited seminars for ministers, deacons and priests

USA v. John Dela Cruz
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

40

**4/05**
Detecting deception in children: An experimental study of the effects of event familiarity on CBCA ratings.

Blandon-Gitlin, I., Pezdek, K., Rogers, M. L. & Brodie, L. (April, 2005). Law and Human Behavior, 29(2), 188-197.

**1/05**
Case study: Maternal Delusional Disorder with Allegations of Child Abuse.

Begovac, Ivan, Begovac, Branka, Rogers, M. L., Franges, Vesna, Brajkovic, Lovorka, Filipcic, Igor, Petravic, Damir. Croatian Medical Journal.

Dr. Begovac and his colleagues live in Croatia. He found an abstract on line for my 1992 article on delusional parents where child abuse was alleged. We began a consulting relationship and provided him with U.S. research as this was a phenomenon they had never seen before. They then decided to publish their case. I provided substantial guidance and advice with the case and the article, and was added as an author.

**11/14/03**
Behavioral characteristics of FDP Perpetrators

Symposium on Severe Child Physical Abuse Department of Pediatrics, Loma Linda University School of Medicine. Invited presentation.

**08/15/03**
Forensic neuropsychological assessment in criminal law cases

Book chapter with Robert J. Sbordone, Martha L. Rogers, Veronica A. Thomas, and Armando de Armas. In Arthur MacNeill Horton Jr. (Editor). Handbook of Forensic Neuro-psychology. NY: Springer Publishing Company.

**04/02/02**
Roadmap to opportunities in forensic mental health settings for the aspiring practitioner

Invited presentation to Psy.D. and MFT graduates and current students at Pepperdine University

**01/04**
Detecting deception in children: Event familiarity affects Criterion Based Content Analysis Ratings.

This study entails the use of Statement Validity Analysis (Criterion Based Content Analysis) [SVA-CBCA] to discriminate from children's transcripts which ones have undergone a painful, invasive medical procedure vs. a routine genito-urinary examination. SVA-CBCA

**Journal of Applied Psychology**, 89(1).
Funded research project with Kathy Pezdek, Ph.D., Professor and Associate Director, Center for Organizational and Behavioral Sciences Psychology Department, Claremont Graduate University, and her students, Iris Blandon-Gitlin and Anne Morrow; Gail Goodman, Ph.D., Professor of Psychology, Director of the Center on Social Sciences & the Law, UC, Davis; Jodi Quas, Ph.D. Assistant Professor, Department of

is a content-based method for analyzing victim statements regarding characteristics reflecting validity in sexual abuse cases.

Psychology & Social Behavior, UC Irvine; Karen J. Saywitz, Ph.D., Harbor/UCLA Medical Center; Sue Bidrose, University of Otago, New Zealand; Margaret-Ellen Pipe, Ph.D., National Institute of Child Health and Human Development; Martha Rogers, Ph.D. and Laura Brodie, Ph.D., Tustin, CA. Another paper completed and accepted by Journal of Applied Psychology; a third study, in progress.

**01/26/02**
Factors influencing children's testimonial capacities in sexual abuse cases

Invited presentation to the Los Angeles Bar Association Annual Meeting for Juvenile Court

**11/17/01**
Four hour seminar on Working in the Juvenile Dependency Courts

Sponsored by the Orange County Psychological Association. This is an invited seminar on problems in evaluation and treatment of adults and children in dependency matters.

**1/20/01**
Evaluation of juvenile sex offenders: When is it 'experimental,' an emerging paraphilic interest pattern, or dangerous?

Invited presentation to the Los Angeles Bar Association Annual Meeting for Juvenile Court

**8/23/99**
Biola and the Internet: Dealing with risks of pornography and deviant sexual exposure on line

A presentation to the Biola University faculty. Based on work of a special advisory committee to the Provost regarding problems of abusing the internet access on campus

**4/23/99**
A *pot pourri* of ethical issues in forensic practice (Child custody, neuropsychology, use of deception by examiners)

Part of a symposium on Ethical Practice sponsored by the Orange County Psychological Association

**6/5/98**
Paraphilias on the Internet

Presentation to the Southern California SAFE Team which consists of local and federal-level law enforcement, local and federal level prosecutors working to monitor the Internet and prosecuting sex offenders. Held at the Orange County Sheriff's Academy, Orange, CA

**10/98**
Use of deception by forensic examiners to assess credibility and motivation

California Psychologist, 31(10), pages 10-12

**4/9/98**
Psychological evaluations in sexual harassment cases

Presentation for the Peter M. Elliot Inn of Court, with Veronica A. Thomas, Ph.D.

USA v. John Dela Cruz
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

42

**4/3/98**
Assessment of autobiographical memory in forensic evaluations

Part of a Symposium, Application of Ethics in Professional Practice: Forensic and Neuropsychology, with Robert A Leark, Ph.D. and Richard Romanoff, Ph.D. Presented at the California Psychological Association Meeting, San Francisco, CA

**4/3/98**
Ethics of deception of a litigant in forensic psychological evaluations

Part of a Symposium, Application of Ethics in Professional Practice: Forensic and Neuropsychology, with Robert A Leark, Ph.D. and Richard Romanoff, Ph.D. Presented at the California Psychological Association Meeting, San Francisco, CA

**1998**
Brown, D., Scheflin, A. W. & Hammond, D. C. [Editors]. Memory, Trauma Treatment, and the Law: An essential reference on memory for clinicians, researchers, attorneys, and judges. NY: W.W. Norton

My work on developing forensic criteria for distinguishing between true and false memories of abuse, based on my work between 1993-1995, was described and summarized in the Brown, *et al.* volume (pp. 624-625 Table 17.2 Rogers' Variables Indicative of Childhood Sexual Abuse]

**11/97**
Some ethical issues in cases where reporting of abuse was delayed

California Psychologist, November, 1997

**11/21/97**
After the diagnosis, then what? Issues of treatment of posttraumatic stress disorder

Defense Research Institute seminar, 'Defense and evaluation of psychological injury cases.' Renaissance Stanford Court Hotel, San Francisco, CA

**11/10/97**
Influence of range, frequency, severity and chronicity of stressors and developmental status on PTSD symptomatology

Jody Ward, Martha L. Rogers, & Caleb Ho. Research presentation at the International Society for Traumatic Stress Studies Meeting, Montreal, Canada

**10/18/97**
Rapid assessment tools

Seminar presented at the Annual Fall Conference, Orange County Psychological Association, Doubletree Hotel, Orange, CA.

**7/28/96**
Retrospective memory of traumatic events in university students: Parameters of recall and current symptomatology: Preliminary findings.

Martha L. Rogers, Jody Ward, Caleb Ho. Presented at an International Research Conference, sponsored by the Family Research Laboratory, University of New Hampshire

**6/18/96**

USA v. John Dela Cruz                                    43
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

| | |
|---|---|
| Retrospective memory of traumatic events in university students: Parameters of recall and current symptomatology: Preliminary findings | Martha L. Rogers, Caleb Ho, Jody Ward. Presented at the NATO Advanced Study Institute on trauma and memory, Port de Bourgenay, France, 6/15-25/96. |

**10/95**
Factors influencing later recall of childhood sexual abuse survivers.

Journal of Traumatic Stress, 8(4), 691-716.

**4/5/95**
(1) Munchausen syndrome

(2) Case example of MBP

Invited presentations at a Physical Child Abuse Prosecution Seminar, California District Attorneys Association, Newport Beach, CA. Provided overview of Munchausen and Munchausen by Proxy vs. intentional or accidental abuse. The case example of MBP was a fictionalized account created by drawing elements from several MBP cases which the author had handled in the past, with a discussion of typical psychological test findings.

**10/94**
Factors to consider in assessing adult litigants' complaints of childhood sexual abuse.

Behavioral Sciences & the Law, 12(3), 279-298. Reviews five broad areas which should be evaluated and considered in assessment of validity of forensic cases

**3/10/94**
The recovered memory controversy: Scientific foundations

A full day workshop sponsored by the California Psychological Association Meeting, San Francisco

**1/22/94**
Ethical dilemmas: Legal and mental health professionals debate the moral and ethical conflicts that impact children and families

Part of a panel presentation, Association of Family and Conciliation Courts, Newport Beach, CA

**12/5/93**
Factors to consider in assessing complaints by adult litigants of adult sexual abuse survivers.

Invited presentation at closed research conference, Clark University, Worcester, Massachusetts

**6/5/93**
Truth finding in child abuse: What do we know? How do we find out? Differentiating between genuine and fabricated allegations of child sexual abuse.

Invited presentation as part of a seminar held at Western State University College of Law, San Diego

**5/8/93**
Toward a standard of care in the treatment of adult sexual abuse survivers: Knowledge base,

Minnesota Psychological Association Meeting, Minneapolis, MN. Presentation regarding

USA v. John Dela Cruz                                    44
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

| | |
|---|---|
| competencies and ethical issues. | practices that can engender mistaken beliefs that one has been abused |
| **10/92**<br>Satanic ritual abuse and the current stage of knowledge | Martha L. Rogers, Special Journal Issue Guest Editor, <u>Journal of Psychology & Theology</u>, 20(3), Fall, 1992. This issue included invited articles and responses from researchers and practitioners from "pro" and "con" sides of the SRA debate including international authors. Purpose of this issue was education and intervention in a professional/religious community from which many mistaken allegations of sexual abuse were emanating in the wake of the controversies surrounding "recovered memories" and "satanic ritual abuse." |
| **10/92**<br>A call for discernment—natural and spiritual: Introductory editorial to a special issue on SRA | <u>Journal of Psychology & Theology</u>, 20(3), Fall, 1992, pp. 175-186. Points out the areas where religious communities need to be more aware of forms of abuse that are well documented, vs. those for which empirical evidence is substantially lacking. Abuse in some religious communities is frequently ignored. |
| **10/92**<br>The Oude Pekela incident: A case study of alleged SRA from the Netherland;<br><br>The Oude Pekela incident: Guest editor's final note | <u>Journal of Psychology & Theology</u>, 20(3), Fall, 1992, pp 257-259. Summarizing the known facts for readers preceding articles by Dutch authors arguing for and against the SRA etiology in the incident; pp. 271-173. Review of forensic and epidemiological aspects not addressed by either side in their discussion |
| **10/92**<br>Journal File: Annotated bibliography of research on SRA | <u>Journal of Psychology & Theology</u>, 20(3), Fall, 1992, pp 306-319. This section of the journal included all of the available research "pro" and "con" as of mid-1992, with critiques. |
| **6/92**<br>Evaluating adult litigants who allege injuries from child sexual abuse. | American Psychological Society, 4th Annual Convention, San Diego, CA |
| **1991**<br>Evaluating an alleged satanic ritual abuser: What we don't know | <u>Issues in Child Abuse Accusations</u>, 3, 166-177. Comparison of purported patterns in alleged SRA perpetrators compared to behavior patterns in known sexual assault perpetrators |

USA v. John Dela Cruz                                                45
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

**1991**
Delusional disorder and the evolution of false sexual allegations.

*American Journal of Forensic Psychology*, 10(1), 47-69. Description of five cases where delusional features led to mistaken sexual abuse allegations in child custody cases, including trends seen in children, their siblings, accused and accusing parents; review of the clinical range of intentionality and level of reality testing in those making mistaken allegations. Article was included in recent book of annotated articles on topic of sexual abuse allegations in the context of divorce

This work was cited and described in a subsequent book: Deaton, W., Long, S., Magana, H. A., Robbins, J. (1995). The Child Sexual Abuse Custody Dispute Annotated Bibliography. Published by Sage, in cooperation with the California Professional Society on the Abuse of Children. Thousand Oaks, CA.

**3/91**
Interviewing sexual assault victims: How to improve reliability and validity of victim statements and assessing credibility in doubtful cases.

Martha L. Rogers and Laura A. Brodie. Workshop for sexual assault investigators regarding interview techniques to improve reliability and validity. California Juvenile Officers' Association, 42nd Annual Training Program

**3/91**
A case of alleged satanic ritualistic abuser: In re B.D., P.A., & K. B. by and through her Guardian Ad Litem, B. B., Plaintiffs vs. Ellen Roe, *et al.*, Defendants (1991).

Paper presented at the American Psychology-Law Society, Division 41, APA, San Diego, CA. An overview of a civil lawsuit, testimony, defense's working hypotheses about what happened to lead to the allegations, and review of evidence and outcomes

**2/23/91**
Ethical issues in forensic psychology for the occasional provider of services to the legal system

Common ethical and procedural pitfalls for psychologist with limited experience in forensic issues. Part of an Ethics Symposium. California Psychological Association Convention, San Diego, CA

**1990**
The critical role of the investigator in interviewing the child witness and the accused sex offender: Perspective and techniques.

Martha L. Rogers and David Echeandia. Prosecutor's Brief, 13(4), 11-14. Published by the California Prosecutors' Association. Reviews elements of good interviewing of victims and perpetrators which facilitate the later 288.1 PC court-ordered exam for sex offenders to aid determination of dangerousness and treatability by the psychologist

**1990**
How we make judgments about child sexual abuse: What do we know?

Laura A. Brodie and Martha L. Rogers
<u>Prosecutor's Brief</u>, 13(4), 15-17. Published by the California Prosecutors' Association. Brief review of factors known to contribute to accuracy or inaccuracy in judgments about the validity of child sexual abuse cases

**1990**
Problems in psychological practice in sexual assault cases.

Martha L. Rogers and David M. Echeandia. <u>Prosecutors' Brief</u>, 13(4), 8-10. Published by the California Prosecutors' Association. Reviews factors involved in People v. Stoll (1989) and People v. Ruiz (1990), psychological evidence and "profiling" in sexual assault cases

1

USA v. John Dela Cruz                                          47
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

1

| Professional Experience |
|---|

| | |
|---|---|
| **1981 to Present** | Rogers, Thomas, Brodie & Ward, An Association of Sole Practitioners. Clinical, Forensic, and Neuropsychology. Began solo practice part-time in Orange County in 1981; full-time in June, 1983; formed limited partnership with Veronica Thomas, Ph.D. in 1992. Laura Brodie, Ph.D. joined in 1995, and Jody Ward, Ph.D. joined in 2000. Dr. Rogers and other colleagues have each separately incorporated and have completely separated their practices as of 7/05. |
| **1975 to 1977** | U. S. Air Force, Wilford Hall USAF Medical Center, San Antonio, Texas; Captain, USAF, Biomedical Sciences Corps, Air Force Staff Psychologist; Associate Director of Clinical Psychology Residency Program Admissions, Adult Outpatient psychiatric services; |
| **1966 to 1970** | Bakersfield Unified High School District, China Lake/Ridgecrest, CA. High school teacher, part-time community college instructor. High school teacher in sciences, health, driver's education, and development of an experimental learning disabled classroom |
| **1964 to 1966** | Department of Neurology, Duke Medical Center, Durham, North Carolina. Research Technician. Engaged in large clinical research grant involved in the study of stroke; animal research in regard to physiological and behavioral changes after experimentally-induced stroke; assistant in clinical neurological procedures and research |

2
3
4

| References |
|---|
| **Note:**  The long and time-honored tradition in the legal system of giving due weight to an opinion depending on the competence and ethics as well as the overall credibility of the person giving it is a good one. It becomes a problem for the legal system when an evaluator is unknown to the parties or to others in their jurisdiction. The following references are provided – you can contact them if further information is needed. |

### Criminal Prosecutors – State Level

| | | |
|---|---|---|
| Robert Olson | Riverside DA's Office [Juvenile, Homicide] | 909-955-5573 |
| Christopher Kralick | Orange County DA's Office [Homicide] | 714-834-3600 |
| Tim Schaff | Riverside County DA's Office [Sexual assault, homicide] | 909-275-5506 |
| John Christl | Orange County DA's Office [Major felonies] | 714-347-8588 |
| Howard Gundy | Orange County DA's Office [Homicide] | 714-347-8469 |
| Michael Hestrin | Riverside DA's Office | 909-955-6433 |

USA v. John Dela Cruz
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

[Homicide]

## Criminal Prosecutors – U. S. Level

| | | |
|---|---|---|
| Kendra McNally | U.S. Attorney's Office, LA | 213-894-2253 |
| Judith Heinz | U.S. Attorney's Office, LA | 213-894-7280 |
| Alka Sager | U.S. Attorney's Office, LA | 213-894-6223 |
| Sandra Klein | U. S. Attorney's Office, LA | 213-894-5421 |

## Criminal Defense Attorneys

| | | |
|---|---|---|
| Leonard Gumlia | OC Deputy Public Defender | 714-834-3308 |
| Hector Chaparro | OC Deputy Public Defender | 714-834-2155 |
| Lisa Kopelman | OC Deputy Public Defender | 714-834-2144 |
| Chuck Hasse | OC Deputy Public Defender (Juvenile and adult criminal) | 714-935-7578 |
| Steve Womack | OC Deputy Public Defender (Juvenile) | 714-935-7578 |
| Harriet Leva | Private attorney – O'Neill, Lysaght, & Sun, Los Angeles (Federal defense) | 310-451-5700 |
| Kenneth Schreiber | Private attorney in OC (Federal and state level adult criminal defense) | 949-852-0411 |
| Robison Harley | Private attorney in OC (Federal adult criminal defense) | 714-542-3146 |
| Tom Goethals | Pohlson, Moorhead, & Goethals, Laguna Hills, CA | Now a judge in OC |

## County Counsel Attorneys

| | | |
|---|---|---|
| Janelle Brock | County Counsel, Orange Cty | 714-935-6716 |
| Margaret Eastman | County Counsel, Orange Cty | 714-935-6816 |
| Mr. Dana Stits | County Counsel, Orange Cty | 714-935-6152 |

## Child Dependency Attorneys (Representing Children)

| | | |
|---|---|---|
| Harold LaFlamme | Orange County Dependency Court | 714-935-1125 |
| Sharon Grier | Child Dependency, Family Law | 714-750-4425 |

## Family Law Attorneys

| | | |
|---|---|---|
| Patricia Phillips | Morrison & Foerster, Los Angeles | 213-892-5814 |
| Thomas Anthony | Private Attorney, Brea, CA | 714-671-3875 |

48

USA v. John Dela Cruz
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

49

| | | |
|---|---|---|
| Michael Guerrerro | Moreno, Becerra, & Guerrero, Montebello, CA | 213-725-1917 |
| Marlin Stapleton, Sr. | Stapleton & Stapleton, Tustin, CA [Family law, child dependency] | 714-832-8003 |
| Michael O'Neill | Private Attorney, Orange County | |

## Civil Litigation (Plaintiff side)

| | | |
|---|---|---|
| Richard G. Anderson | Private Attorney (Personal Injury), Upland, CA | 909-949-2226 |
| James Lee | Private Attorney (Personal Injury), Las Vegas, Nevada | 702-382-3532 |
| Dana Scruggs | Private attorney (Personal Injury) Santa Cruz, CA | 408-457-3700 |
| Harland Burge | Burge, Strid, & Dickenson, Laguna Hills, CA [Both plaintiff and defense civil litigation, including personal injury, malpractice] | 949-699-4160 |
| Sherry Honer | Personal injury/plaintiff side (sex abuse cases), Tustin, CA | 714-544-6000 |

## Civil Litigation (Defense side)

| | | |
|---|---|---|
| John Anderson | Siefert & Henderson, Pasadena, CA | 818-449-7723 |
| Harland Burge | Burge, Strid, & Dickenson, Orange Cty [Personal Injury] | 714-699-4160 |
| Michael Levanas & John Carlson | Randolph & Levanas, Santa Monica, CA [Personal injury, dependency] | 310-395-7900 |
| Keith Wyatt, Esq. and Karleen Warren, Esq. | Ivy, McNeill & Wyatt, Los Angeles, CA [Personal injury/sex abuse] | 213-482-8890 |

## Judges

| | | |
|---|---|---|
| Hon. Daniel Didier | Supervising Judge, OC | 714-834-3792 |
| Hon. Kazuharu Makino | Central Felony Trial | 714-834-5201 |
| Hon. Gregg Pricket | Superior Court, Orange Cty | 714-773-4555 |

USA v. John Dela Cruz
Case Number 04-00185-02 SOM
Privately Retained Psychological Evaluation

[Criminal]

50

| Hon. Gary S. Paer | OC Superior Court, Criminal Dept. C37 | 714-834-4759 |
| Hon. Frank Fasel | OC Superior Court, Criminal Dept. C41 | 714-834-4565 |

1
2
3

4